[No. A040678. First Dist., Div. One. Aug. 24, 1989.]

ERNEST L. PRICE et al., Plaintiffs and Appellants, v.
WELLS FARGO BANK et al., Defendants and Respondents.

COUNSEL

Silveira, Mattos & Lewis and Weldon J. Mattos, Jr., for Plaintiffs and Appellants.

Brobeck, Phleger & Harrison, David J. Brown and Kent M. Roger for Defendants and Respondents.

OPINION

NEWSOM, Acting P. J.—Ernest L. Price and Maxine Price (hereafter appellants) appeal from a summary judgment in favor of Wells Fargo Bank and Pamela G. Bogle (hereafter respondents). The action was filed on July 12, 1985 in the Superior Court of Merced County and later transferred to the Superior Court of the City and County of San Francisco. The amended complaint chiefly concerned three related loan transactions and stated five causes of action: fraud, tortious breach of covenant of good faith, contractual breach of covenant of good faith, negligent infliction of emotional distress, and intentional infliction of emotional distress. An additional cause of action alleged fraud in connection with a separate mobilehome loan.

On July 1, 1987, respondents filed a motion for summary judgment or, alternatively, summary adjudication of issues. The trial court granted summary judgment for both defendants on all causes of action and, somewhat

inconsistently, summarily adjudicated various issues. Appellants attacked the summary judgment through motions for reconsideration, new trial, and relief under Code of Civil Procedure section 473 and, upon denial of these motions, filed a timely notice of appeal.

For 20 years, appellants owned and operated the Creekview Angus Ranch near Merced, California. In 1982, the ranch comprised 1,872 acres of grazing land and 698 head of cattle. In addition, appellants leased another 1,228 acres of adjoining land from in-laws at a modest price. They concentrated their operations on raising purebred angus cattle and hoped to establish a registered herd over a period of years. As sidelines, they maintained a small almond orchard and a substantial apiary business with 3,000 hives. The ranch was subject to deeds of trust securing loans of Crocker Bank and Travelers Insurance Company which had balances, respectively, of $225,000 and $137,378.

In 1982, Crocker Bank informed appellants that it would not extend them any further credit. Seeking a means of paying off the Crocker loan, they approached Wayne Hadsel, the Merced branch manager for Wells Fargo, with a request for a five-year loan. Their loan application was processed by Clifford Wictorin, a loan officer at the Merced branch. On February 14, 1983, Wictorin recommended in a report to Edward Farnam, the agribusiness district manager of Wells Fargo, that the bank extend credit to appellants. The report contained projections of the appellants' gross income but was lacking in any precise estimates of their expenses. For example, it projected an income of $385,000 from their apiary operation but neglected to mention estimated expenses of $343,000. Farnam approved the loans but later attributed his approval to a mistaken understanding of appellants' expenses.

On February 28, 1983, Wells Fargo extended to appellants three loans, secured by substantially all the ranch property, in the amounts of $63,000, $97,000, and $210,000. The promissory notes for the $63,000 and $97,000 loans provided that "[p]rincipal shall be payable in full on October 31, 1983." The $210,000 promissory note was less clear. The relevant portion stated: "Principal shall be payable as follows: One principal payment of Forty Two Thousand and no/100 Dollars ($42,000.00) due on September 30, 1983. Anything herein to the contrary notwithstanding, all principal and interest remaining unpaid on October 31, 1983 shall be immediately due and payable." The testimony of Wictorin and Farnam on deposition and certain documents secured from the bank in discovery indicated that the parties actually contemplated that the loan would be repaid over five years, with annual principal payments of $42,000.

Both Ernest and Maxine Price testified that they were surprised to read the October 31, 1983, maturity date on the promissory notes and protested to Wictorin that they couldn't possibly pay the loans off by that date. According to Maxine Price, he reassured them that the loans "would be redid on the five-year program that we were going to be on." On August 19, 1983, Wells Fargo extended another $15,000 loan to appellants for purchase of a mobilehome.

Nearly the full amount of the loans was to be applied to repayment of the Crocker Bank and Travelers Insurance Company loans; a balance of only about $12,000 was available to cover operating expenses of the ranch. Later in the year, appellants invested the proceeds of cattle sales in a major capital improvement—the construction of a sales pavilion, including a barn and corrals, to conduct public cattle auctions. There is some evidence that bank officials were aware of appellants' plans to construct this facility; Wictorin's credit report refers to Ernest Price's marketing plan "to increase exposure through cattle shows and publications and conduct annual sales at his home ranch"; and Ernest Price asserted that he showed Wictorin the planned locations of the facility. Nevertheless, Wells Fargo officials expressed surprise when they learned that appellants had made this large capital investment and charged that it represented an unauthorized diversion of ranch income.

From May through November 1983, appellants made a number of interest payments on the three loans. As the maturity dates approached, Ernest Price sought some kind of accommodation in several conversations with Wictorin in late September and October. According to Price's deposition testimony, Wictorin assured him that he would "redo" the notes. Appellants let the October 31, 1983, maturity date pass without making any payments of principal.

On November 21, 1983, appellants received a letter from Wictorin announcing that their loans were past due, followed by a similar letter on December 13, 1983. They concede that they made no further payments on the loans that year and never disputed that the amounts were due. Instead, they attempted to initiate discussions to restructure the loans. The matter was referred to the Wells Fargo loan adjustment department which handled delinquent accounts. On February 3, 1984, appellants received a letter from Pamela Bogle, an assistant vice-president of Wells Fargo, announcing that all sums were due and payable on the loans and threatening foreclosure.

Without contesting that the loan payments were due, appellants arranged a meeting with Bogle at their ranch on March 8, 1984, to discuss a revised payment schedule. The parties reached an apparent agreement. A letter of

Bogle dated March 19, 1984, stated their agreement as follows: "(1) Delinquent interest will be paid current on or before April 15, 1984 and will be kept current according to the terms of the original promissory notes. (2) You will commence to make principal reductions on April 15, 1984 in the amount of $15,000 and future payments will continue in the following manner:

| | |
|---|---|
| May 1984 | $15,000 |
| July 1984 | 20,000 |
| August 1984 | 25,000 |
| September 1984 | 70,000 |
| October 1984 | 12,500 |
| November 1984 | 24,500 |
| December 1984 | 10,000 |
| January 1985 | 10,000 |
| February 1985 | 10,000 |
| March 1985 | 22,500" |

Appellants fell badly behind this repayment schedule, paying only $15,000 in principal on April 18, 1984, $24,323.71 in delinquent interest on June 5, 1984 and $10,000 in principal on June 20, 1984. In December 1984, Wells Fargo attached an Agriculture Commodity Credit Corporation check in the amount of $22,738 payable to their apiary business. Bogle wrote to appellants on May 17, September 4, November 21, and December 6, 1984, informing them of their continued default and advising them to liquidate assets to pay for the loans. In their correspondence with the bank, appellants never questioned their obligations but rather promised to make additional payments.

In September 1984, Wells Fargo initiated foreclosure proceedings by filing a notice of default. Appellants subsequently retained an attorney, Weldon J. Mattos, Jr., who arranged a meeting on December 12, 1984, with Bogle, Wictorin, and Farnam at the branch office of the bank. Following the meeting, Mattos proposed a revised repayment schedule which Bogle quickly rejected. The next month, however, Bogle agreed to postpone a trustee's sale in consideration of a small payment of $6,000. After further negotiations, Bogle issued a modified ultimatum in a letter dated February 19, 1985. The bank agreed to forebear publishing notice of trustee's sale on condition that appellants (1) make a payment of $50,000 on February 20, 1985, (2) assign to the bank the proceeds of a pending escrow for the sale of the almond orchard, (3) assign to the bank the proceeds of any loan from the Farmers Home Loan Administration, if they should succeed in securing such a loan, and (4) pay all amounts outstanding by June 10, 1985.

On behalf of appellants, Mattos accepted the terms of Bogle's ultimatum but stated that appellants could not make the first payment until March 1, 1985. On that date, appellants in fact paid Wells Fargo $50,000. They borrowed from a friend to make a further payment of $90,000 on June 10, 1985. Not satisfied with this partial payment, the bank published a notice of trustee's sale to be held by July 9, 1985. Securing a loan from another individual, appellants presented Wells Fargo on June 24, 1985, with a check in the amount of $146,211.09 in full payment of the outstanding loan balances. As the private loan was drawn on an out-of-state bank, the appellants' check unfortunately did not clear. On June 28, 1985, however, appellants finally paid off the loans with a second check for $146,211.09, plus a small additional interest payment of $676.54.

A few days after paying off the loan, appellants sued Wells Fargo, alleging as damages that they were forced to sell bee hives, trucks, cattle, and a 60-acre parcel of land for distressed prices in order to make the final payments.

■ On appeal, an order granting summary judgment must be reviewed de novo. (*AARTS Productions, Inc.* v. *Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064 [225 Cal.Rptr. 203].) The governing statute provides: "The motion for summary judgment shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. . . ." (Code Civ. Proc., § 437c, subd. (c).) ■ As a gloss on this statutory standard, the courts have cautioned that " '[t]he moving party bears the burden of furnishing supporting documents that establish that the claims of the adverse party are entirely without merit on any legal theory.' " (*Mann* v. *Cracchiolo* (1985) 38 Cal.3d 18, 35 [210 Cal.Rptr. 762, 694 P.2d 1134].) "All reasonable inferences are drawn in favor of the party opposing the summary judgment . . . ." (*Neinstein* v. *Los Angeles Dodgers, Inc.* (1986) 185 Cal.App.3d 176, 179 [229 Cal.Rptr. 612].) In ruling on a motion for summary judgment, the trial court seeks to identify triable issues without engaging in any determinations of fact. (*D.E. Sanford Co.* v. *Cory Glass Etc. Co.* (1948) 85 Cal.App.2d 724, 726 [194 P.2d 127].) "The trial court is, however, to some extent required to weigh evidence in determining whether the factual issues asserted relate to a 'material fact,' and must determine what 'inferences [are] reasonably deducible from [the] evidence.' " (*Sawyer* v. *First City Financial Corp.* (1981) 124 Cal.App.3d 390, 406 [177 Cal.Rptr. 398].)

The tort theory in appellants' cause of action for breach of the implied covenant of good faith and fair dealing is based on a recent, and already discredited, precedent: *Commercial Cotton Co.* v. *United California Bank*

(1985) 163 Cal.App.3d 511, 516 [209 Cal.Rptr. 551]. The case concerned a simple fact situation covered by division 4, chapter 4, of the California Uniform Commercial Code. The bank paid out $4,000 from the plaintiff's checking account on a check containing unauthorized signatures. Almost two years later, the plaintiff discovered the loss and made a claim to the bank for reimbursement. On the advice of its general counsel, the bank refused the claim on the ground that it was barred by a one-year statute of limitations. In fact, the decision of *Sun 'n Sand, Inc.* v. *United California Bank* (1978) 21 Cal.3d 671 [148 Cal.Rptr. 329, 582 P.2d 920], decided 11 days before the bank refused the claim, clearly indicated that a 3-year statute of limitation applied.

Alleging breach of the covenant of good faith and fair dealing, plaintiff sued the bank and recovered $4,000 in compensatory damages and $100,000 in punitive damages. Since punitive damages may be awarded only in "an action for the breach of an obligation not arising from contract" (Civ. Code, § 3294, subd. (a)), the validity of the award of punitive damages turned on whether the cause of action for breach of the covenant of good faith stated a cause of action in tort or contract. Holding that the cause of action was in tort, the court advanced two novel legal concepts in a single, somewhat confusing, paragraph.

The court in *Commercial Cotton* relied on language in *Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809 [169 Cal.Rptr. 691, 620 P.2d 141] emphasizing that the relationship between insurer and insured is "characterized by elements of public interest, adhesion, and fiduciary responsibility . . . ." (*Commercial Cotton Co.* v. *United California Bank, supra,* 163 Cal.App.3d at p. 516.) With reference to these elements, the court stated: "Analogizing to the factors set out in *Egan* we agree with Calvin's contention that banking and insurance have much in common, both being highly regulated industries performing vital public services substantially affecting the public welfare. A depositor in a noninterest-bearing checking account, except for state or federal regulatory oversight, is totally dependent on the banking institution to which it entrusts deposited funds and depends on the bank's honesty and expertise to protect them. While banks do provide services for the depositor by way of monitoring deposits and withdrawals, they do so for the very commercial purpose of making money by using the deposited funds. The depositor allows the bank to use those funds in exchange for the convenience of not having to conduct transactions in cash and the concomitant security in having the bank safeguard them. The relationship of bank to depositor is at least quasi-fiduciary, and depositors reasonably expect a bank not to claim nonexistent legal defenses to avoid reimbursement when the bank negligently disburses the entrusted funds. Here, UCB's claimed defenses are spurious, and the jury found experienced legal counsel interposing them in an unjustifiable, stonewalling effort to

prevent an innocent depositor from recovering money entrusted to and lost through the bank's own negligence, is a breach of the bank's covenant of good faith and fair dealing with its depositor." (*Ibid.*)

The court premised tort liability for breach of the covenant of good faith alternatively on (1) the existence of a special relationship between depositor and bank within the meaning of *Egan* v. *Mutual of Omaha Ins. Co., supra,* 24 Cal.3d 809 and (2) on an apparently new tort of bad faith defense, perhaps derived in some manner from *Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752 [206 Cal.Rptr. 354, 686 P.2d 1158]. We are concerned here only with the first of these theories. The analysis of a special relationship rested not only on the familiar concepts of public interest and adhesion but on the innovative assertion that the relationship between a bank and depositor is "quasi-fiduciary" in nature. In a later case, *Barrett* v. *Bank of America* (1986) 183 Cal.App.3d 1362 [229 Cal.Rptr. 16], the same court similarly characterized the relationship between a bank and its loan customers. The issue in *Barrett* was the duty of the court to give an instruction on constructive fraud. The court noted that constructive fraud "usually arises from a breach of duty where a relation of trust and confidence exists." (*Id.* at p. 1369.) Citing *Commercial Cotton'* as authority for a "quasi-fiduciary" relationship between a bank and depositor, the court found that "a similar relationship of trust and confidence exists between a bank and its loan customers . . . ." (*Ibid.*)

The holdings of *Commercial Cotton* and *Barrett* are inconsistent with both past authority and current trends in the law.[1] ▪ It has long been regarded as "axiomatic that the relationship between a bank and its depositor arising out of a general deposit is that of a debtor and creditor." (*Morse* v. *Crocker National Bank* (1983) 142 Cal.App.3d 228, 232 [190 Cal.Rptr. 839].) "A debt is not a trust and there is not a fiduciary relation between debtor and creditor as such." (*Downey* v. *Humphreys* (1951) 102 Cal.App.2d 323, 332 [227 Cal.Rptr. 484].) The same principle should apply with even greater clarity to the relationship between a bank and its loan customers.

A case decided only three days before *Commercial Cotton* made short shrift of a claim that a fiduciary relationship existed between a bank and its depositor. In *Lawrence* v. *Bank of America* (1985) 163 Cal.App.3d 431 [209 Cal.Rptr. 541], the plaintiff sued the bank for dishonoring a check. The second cause of action alleged breach of fiduciary duty. Dismissing this

---

[1] See the devastating criticism of the *Commercial Cotton* decision in *The Fiduciary Controversy: Injection of Fiduciary Principles Into the Bank-Depositor and Bank-Borrower Relationships* (1987) 20 Loyola L.A. L.Rev. 795, 810-821, and *Commercial Cotton Co. v. United California Bank: California's Newest Extension of Bad Faith Litigation Into Commercial Law* (1986) 16 Sw.U.L.Rev. 645, 678-687.

claim, the court stated, "[U]nder ordinary circumstances the relationship between a bank and its depositor is that of debtor-creditor, and is not a fiduciary one; and appellant has failed to allege any facts which would support a finding that a fiduciary relationship existed between appellant and any of the respondents in this case." (*Id.* at p. 437.)

Since *Commercial Cotton* and *Barrett* were decided, the law has moved decisively away from expansion of the tort of breach of the implied covenant of good faith. The tort, of course, has its origins in insurance law; in *Crisci* v. *Security Ins. Co.* (1967) 66 Cal.2d 425 [58 Cal.Rptr. 13, 426 P.2d 173], the Supreme Court first allowed an insured to recover from an insurer in tort for emotional suffering resulting from breach of the implied covenant. Tort recovery on this theory was later extended to employment contracts by *Cleary* v. *American Airlines, Inc.* (1980) 111 Cal.App.3d 443 [168 Cal.Rptr. 722] and its progeny. (E.g., *Gray* v. *Superior Court* (1986) 181 Cal.App.3d 813, 820-821 [226 Cal.Rptr. 570]; *Khanna* v. *Microdata Corp.* (1985) 170 Cal.App.3d 250, 260-262 [215 Cal.Rptr. 860].) Through dicta in *Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co., supra,* 36 Cal.3d 752, 769, the Supreme Court suggested that this form of tort recovery might be appropriate wherever there are "relationships with similar characteristics" to those of insurer and insured. Pursuing this suggestion, *Wallis* v. *Superior Court* (1984) 160 Cal.App.3d 1109 [207 Cal.Rptr. 123] proposed a five-part test for determining the existence of a special relationship justifying tort recovery for breach of the implied covenant. The *Wallis* court found that a severance contract between employer and employee fell within such a special relationship. Three subsequent cases applying the same test to other commercial transactions, however, found the special relationship to be absent. (*Martin* v. *U-Haul Co. of Fresno* (1988) 204 Cal.App.3d 396, 413 [251 Cal.Rptr. 17]; *Multiplex Ins. Agency, Inc.* v. *California Life Ins. Co.* (1987) 189 Cal.App.3d 925, 931 [235 Cal.Rptr. 12]; *Quigley* v. *Pet, Inc.* (1984) 162 Cal.App.3d 877, 889 [208 Cal.Rptr. 394].)

This evolution of the law was dramatically upset last year by *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 693 [254 Cal.Rptr. 211, 765 P.2d 373]. The decision did not address *Wallis* v. *Superior Court, supra,* 160 Cal.App.3d 1109 and its progeny but rather reversed the earlier line of cases stemming from *Cleary* v. *American Airlines, Inc., supra,* 111 Cal.App.3d 443. The court held that *Cleary* lacked justification in policy or precedent for extending to employment contracts the tort recovery allowed for breach of the implied covenant in insurance contracts: "We therefore conclude that the employment relationship is not sufficiently similar to that of insurer and insured to warrant judicial extension of the proposed additional tort remedies . . . ." The court's analysis affirmed the wisdom of "the traditional separation of tort and contract law" (*id.* at p. 693) and described the dicta in *Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co., supra,* 36

Cal.3d 752, 768-769, suggesting possible extension of tort remedies for breach of the implied covenant as being "tentative at best." (*Id.* at p. 688.)

The impact of the *Foley* decision cannot be assessed with certainty. The strict terms of its holding leave intact *Wallis* v. *Superior Court, supra,* 160 Cal.App.3d 1109; until the Supreme Court says otherwise, it may still be argued that a noninsurance contract was "tortiously breached if it contained characteristics similar to those which allow a finding of tortious breach in an insurance contract." (*Id.* at p. 1118, fn. deleted.) But the implications of the court's analysis presage a close scrutiny of tort recovery for breach of the implied covenant of good faith and fair dealing outside of the insurance context. (See *Mitsui Manufacturers Bank* v. *Superior Court* (1989) 212 Cal.App.3d 726 [260 Cal.Rptr. 793].) The decision surely precludes the sort of loose extension of tort recovery, based on "quasi-fiduciary" relationship, sanctioned in *Commercial Cotton* v. *United California Bank, supra,* 163 Cal.App.3d 511.

■ In the present case, appellants do not contend that their agreement with Wells Fargo satisfies the rigorous five-part test of the *Wallis* decision. Nor do they seek to prove special circumstances that might conceivably give a fiduciary character to a lender/borrower relationship. Relying on *Commercial Cotton* and *Barrett,* the complaint alleges only that plaintiffs "were customers of WELLS FARGO BANK, NATIONAL ASSOCIATION and had bank accounts, including checking, with defendant, WELLS FARGO, maintained at the Merced Branch of WELLS FARGO, and have been the beneficiaries of a fiduciary relationship with defendant, WELLS FARGO." These allegations, together with a description of the loan transactions, plainly are insufficient to state a tortious breach of the covenant of good faith and fair dealing.

For the first time in this appeal, appellants argue that Wells Fargo is liable in tort under *Seaman's Direct Buying Services, Inc.* v. *Standard Oil Co., supra,* 36 Cal.3d 752. The tort defined in *Seaman's,* however, is distinct from breach of the implied covenant of good faith and fair dealing; it occurs when a party "seeks to shield itself from liability by denying, in bad faith and without probable cause" that the contract exists. In their opening brief, appellants urge that Wells Fargo in fact denied the existence of a "renewal agreement." This theory, however, finds no expression in the pleadings and cannot be considered for purposes of summary judgment. (*Kruse* v. *Bank of America* (1988) 202 Cal.App.3d 38, 57-60 [248 Cal.Rptr. 217].)

■ Turning to more firmly established legal principles, appellants urge that the record shows a triable issue of fact concerning contractual breach of the implied covenant of good faith and fair dealing in both the original loans and the March 19, 1984, repayment agreement. ■ "Every

contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." (Rest.2d Contracts, § 205.) The term "good faith" has been described as an " 'excluder' phrase which is 'without general meaning (or meanings) of its own and serves to exclude a wide range of heterogenous forms of bad faith. In a particular context the phrase takes on specific meaning, but usually this is only by way of contrast with the specific form of bad faith actually or hypothetically ruled out.' " (*Foley* v. *Interactive Data Corp., supra,* 47 Cal.3d 654, 697, quoting Summers, *"Good Faith" in General Contract Law and the Sales Provisions of the Uniform Commercial Code* (1968) 54 Va.L.Rev. 195, 201.) For example, the covenant precludes an owner from interfering with work of a contractor in performance of a construction agreement. (1 Witkin, Summary of Cal. Law (9th ed. 1987) § 745, p. 676.)

■ Appellants here argue that Wells Fargo breached the implied covenant by taking a "hard line" in repayment negotiations. In particular, they rely on the testimony of John Richards, an expert witness of Wells Fargo, who conceded that, in his opinion, Pamela Bogle was not justified in publishing a notice of foreclosure sale after having received a $90,000 payment on June 10, 1985. The necessary implication of appellants' argument is that the bank owed them a duty of reasonable forebearance in enforcing its creditor's remedies. They do not, however, cite any authority supporting this proposition, and we are aware of none. Contracts are enforceable at law according to their terms. The covenant of good faith and fair dealing operates as " 'a kind of "safety valve" to which judges may turn to fill gaps and qualify or limit rights and duties otherwise arising under rules of law and specific contract language.' " (*Foley* v. *Interactive Data Corp., supra,* 47 Cal.3d 654, 684, quoting Summers, *The General Duty of Good Faith—Its Recognition and Conceptualization* (1982) 67 Cornell L.Rev. 810, 812.) It does not impose any affirmative duty of moderation in the enforcement of legal rights. The equitable doctrines of estoppel or waiver may, of course, bar unfair tactics in the enforcement of agreements, but appellants have not raised any such equitable defenses.

■ Apart from the implied covenant of good faith, appellants do not claim that Wells Fargo breached any contractual obligation. Rather they contrive to state their grievance alternatively in the form of a cause of action for fraud. The complaint alleges both intentional fraud and fraudulent concealment.[2] The intentional misrepresentations consisted of statements by the bank employees, Wictorin and Hadsel, that "WELLS FARGO, would 'work with' the plaintiffs in the matter of repayment of the promissory

---

[2] We do not consider the theories of negligent misrepresentation and constructive fraud, urged in appellants' opening brief, since these theories were not pled in the complaint and were raised for the first time on appeal.

notes, [and] would renew the promissory notes for up to five (5) years . . . ." Though the elements of fraudulent concealment are not clearly alleged, appellants urge that the record reveals that the bank agents and employees concealed (1) that Wictorin did not have authority to approve the renewal of the loans, (2) that renewal of the $210,000 loan was conditioned on the payment of the $97,000 and $63,000 loans, (3) that Wells Fargo would consider the loans in default if not paid by October 31, 1983, and (4) that the bank officials handling their loans would not be knowledgeable about agriculture.

With two exceptions, the alleged fraud concerns oral promises relating to the principal terms of the loan agreement. The gravamen of appellant's theory of fraud is that the written loan agreements varied from the terms of the agreement they had expected; that bank employees orally promised them that the written agreement would be administered in a manner consistent with their original expectations; that the bank "never intended" to perform the agreements pursuant to these oral promises; and that they relied to their detriment on the promises. These allegations appear to raise the difficult and disputed question of the relationship between promissory fraud and the parol evidence rule. Wells Fargo has raised the defense of the parol evidence rule, however, only with respect to the third cause of action relating to the mobilehome loan. As the issue has been briefed only in this connection, we will not discuss it here. The summary judgment on the fraud cause of action must be affirmed on other grounds.

Wells Fargo argued successfully in the trial court that, since appellants' own admissions revealed that they understood the nature of their obligations to Wells Fargo, they cannot assert that they relied to their detriment on the promises of bank employees that they were subject to other, less stringent, obligations. We will first examine the admissions and then consider their significance for purpose of summary judgment.

The admissions were in part circumstantial. As recounted earlier in this opinion, appellants conceded that they never disputed Wells Fargo's demands for payment. ■ "A failure to question . . . a bill or statement is uniformly received as evidence of an admission of its correctness." (Cleary, McCormick on Evidence (3d ed. 1984) § 270, p. 802.) Similarly, throughout the duration of the agreement appellants made a number of payments of interest and principal without contesting their obligations. ■ If a party makes a partial payment " 'without protest and without otherwise indicating non-recognition of the validity of the claim, evidence of the payment is universally received [as proof of the validity of the claim].' " (6 Cal. Law Revision Com. Rep. (1964) subds. (a) and (b) of rule 52, p. 676, quoting The American Law Institute's Comment on Model Code rule 309(3).)

 Portions of the deposition testimony of Ernest and Maxine Price tended to confirm these tacit admissions; both conceded that they understood that the maturity date of the three loans was October 31, 1983. Even more damaging were the admissions in the letters of appellants' counsel. A letter of Weldon Mattos to Pamela Bogle, dated December 12, 1984, states, "[a]s I indicated at our meeting, there is no question that the Prices did not make the payments to Wells Fargo when due." In a letter to W.E. Farnam of the same date, Mattos concedes, "[t]he Prices are not denying that they have not been able to make the payments on the schedule that they foolishly agreed to . . . ." A second letter to Pamela Bogle, dated December 17, 1984, states, "[w]e are not asking that the Bank terminate the foreclosure, but simply that they hold off for a brief period of time to allow for a less catastrophic solution to the Prices' obligation to Wells Fargo."[3]

Arguing that these admissions are decisive, Wells Fargo cites *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 22 [112 Cal.Rptr. 786, 520 P.2d 10], for the proposition that admissions are entitled to high credibility

[3] Appellants now argue that the trial court was barred under Evidence Code section 1152 from considering this correspondence in the motion for summary judgment. Section 1152 codifies the rule that "[a]n offer to settle or compromise a claim by paying a sum of money or giving other consideration is *not admissible to prove liability* on the part of the offeror." (1 Witkin, Cal. Evidence (3d ed. 1986) § 424, p. 398.) "[T]he obvious policy of the statute is to avoid deterring parties from making offers of settlement and to facilitate candid discussion which may lead to settlement of disputes." (*Fieldson Associates, Inc.* v. *Whitecliff Laboratories, Inc.* (1969) 276 Cal.App.2d 770, 773 [81 Cal.Rptr. 332].) But we find nothing in the record suggesting that there was any dispute over appellants' obligations under the loan agreements at the time the letters were written. Indeed, the letters affirmatively disclose that no dispute existed. Under these circumstances, Evidence Code section 1152 did not apply.

*Warner Constr. Corp.* v. *City of Los Angeles* (1970) 2 Cal.3d 285 [85 Cal.Rptr. 444, 466 P.2d 996] is instructive on this point. During the month of February 1965, plaintiff notified the city that it was unwilling to continue work on a construction project without a change order. On March 8, 1965, the city sent plaintiff a letter rejecting the need for such a change order. In later correspondence in March, the parties nevertheless made certain mutual accommodations. The city sought to introduce evidence of the March correspondence "to show the contemporaneous and practical construction of the contract." (*Id.* at p. 296.) Plaintiff countered that the correspondence was barred by Evidence Code section 1152. The Supreme Court observed that evidence is admissible that tends to prove "[t]he 'construction given the contract by the acts and conduct of the parties with knowledge of its terms, *before any controversy has arisen as to its meaning* . . . .'" (*Id.* at pp. 296-297.) But it noted, "[b]y March 8, 1965, the parties had reached a stage of clear disagreement on the crucial question whether plaintiff was entitled to a change order." (*Id.* at p. 297.) Accordingly, the court held that Evidence Code section 1152 precluded the admission of the correspondence. Applying these principles to the present case, we find that the letters in question were written before any controversy had arisen as to the meaning of the loan agreements. Hence, they are not barred by section 1152 but are admissible to show the "practical construction" of the loan agreements by the parties.

This analysis also applies to references to the deposition of Weldon J. Mattos in "Event 11" of the exhibit appendix to the motion for summary judgment. We see no materiality in the remaining document mentioned in this assignment of error, Mattos's letter to Bogle dated March 5, 1985.

in motions for summary judgment: "As the law recognizes in other contexts (see Evid. Code, §§ 1220-1230) admissions against interest have a very high credibility value. . . . Accordingly, when such an admission becomes relevant to the determination, on motion for summary judgment, of whether or not there exist triable issues of *fact* (as opposed to legal issues) between the parties, it is entitled to and should receive a kind of deference not normally accorded evidentiary allegations in affidavits." The holding of *D'Amico* appears entirely sound on its facts; and this court has recently applied the decision where credible admissions on deposition were contradicted only by self-serving declarations of a party. (*Advanced Micro Devices, Inc.* v. *Great American Surplus Lines Ins. Co.* (1988) 199 Cal.App.3d 791 [245 Cal.Rptr. 44]. But *Leasman* v. *Beech Aircraft Corp.* (1975) 48 Cal.App.3d 376, 382 [121 Cal.Rptr. 768], phrased the holding in broad language that should be accepted with caution: "Accordingly, when a defendant can establish his defense with the plaintiff's admissions . . . the credibility of the admissions are valued so highly that the controverting affidavits may be disregarded as irrelevant, inadmissible or evasive." (See also *Niederer* v. *Ferreira* (1987) 189 Cal.App.3d 1485, 1503 [234 Cal.Rptr. 779]; *Shapero* v. *Fliegel* (1987) 191 Cal.App.3d 842, 849 [236 Cal.Rptr. 696].)

Apparently accepting the language of *Leasman* at face value, Weil and Brown comment: "Note that if the case went to trial, the judge or jury might choose to believe the contradictory testimony. But for summary judgment purposes, a party is *bound* by his or her admissions made in the course of discovery!" (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (1988) ¶ 10:84.) As the commentators' exclamation point suggests, an uncritical application of the *D'Amico* decision can lead to anomalous results, inconsistent with the general principles of summary judgment law. ▮▮▮ We do not interpret the decision, however, as saying that admissions should be shielded from careful examination in light of the entire record. A summary judgment should not be based on tacit admissions or fragmentary and equivocal concessions, which are contradicted by other credible evidence. We are persuaded that the trial court properly relied on the admissions in the case at bar only because we find nothing in the record that is materially inconsistent with the admissions.

On deposition, both Ernest and Maxine Price reiterated again and again that they thought they had a "five-year deal." They acknowledged, however, that the three promissory notes had a maturity of one year. When pressed for clarification, they expressed two distinct understandings. First, they construed the $210,000 loan as being payable over a five-year period with annual principal payments of $42,000. As we have seen, the note was indeed ambiguous on this point, and the Prices' interpretation was entirely plausible. But the issue does not enter into the present lawsuit because the Prices never made the annual principal payments of $42,000 that the note

arguably called for. In the trial court, they never contended that Wells Fargo failed to comply with this interpretation of the note.

██ Secondly, the Prices insisted that the notes would be "redone." This understanding clearly applied to the $63,000 and $97,000 loans but appeared also to extend to the $210,000. The difficulty is that the Prices nowhere specify any understanding as to the terms of renewal. The terms of a restructuring agreement obviously may vary as widely as the terms of the original agreement. Unless an agreement to restructure a loan embodies definite terms, capable of enforcement, it is not a legally valid contract. "Preliminary negotiations or an agreement for future negotiations are not the functional equivalent of a valid, subsisting agreement." (*Kruse* v. *Bank of America, supra,* 202 Cal.App.3d 38, 59.) The Prices' understanding that the notes would be "redone" thus raises no triable issue as to a legally enforceable understanding inconsistent with the written terms of the notes.

The third cause of action alleging fraud in procurement of the $15,000 mobilehome loan raises clearly the issue of the relationship between promissory fraud and the parol evidence rule. Appellants allege that Bank of America offered to make the loan at a 13 percent interest rate, and a Wells Fargo loan officer countered by promising that Wells Fargo would loan the money "at a better interest rate than Bank of America." In reliance on this promise, they applied for a loan at Wells Fargo; but "[w]hen the promissory note was ready for signing," they discovered that the interest rate was 3 percent above prime, a rate higher than the 13 percent offered by the Bank of America. At that time, however, "Bank of America was no longer offering the same rate on mobilehome loans." Consequently, appellants had no alternative but to accept the Wells Fargo loan at the higher rate of interest.

Without considering other difficulties with this cause of action, we will discuss only the parol evidence rule. Under California law, fraud may consist of "[a] promise made without any intention of performing it." (Civ. Code, § 1572.) To incur such liability for fraud, BAJI 12.40, subdivision (1) states that "[t]he defendant must have made a promise as to a material matter and, at the time he made it, he must have intended not to perform it . . . ." *Kett* v. *Graeser* (1966) 241 Cal.App.2d 571 [50 Cal.Rptr. 727] provides an apt example. The plaintiffs there bought a home in reliance on the defendant's promise that certain repairs would be performed by a licensed contractor. Reversing a summary judgment in favor of defendant, the court held that there was a triable issue of fact as to whether the defendant did not intend to perform the promise at the time it was made.

██ The parol evidence rule in general does not preclude proof of fraudulent oral misrepresentations (2 Witkin, Cal. Evidence (3d ed. 1986)

§§ 997, 999, pp. 944-945), but the early case of *Bank of America etc. Assn.* v. *Pendergrass* (1935) 4 Cal.2d 258 [48 P.2d 659] perceived a conflict between the rule and promissory fraud relating to the principal terms of an agreement. The case concerned a promissory note that by its terms was payable on demand. The plaintiffs sought to prove that the bank orally promised, without any intention of honoring the promise, that "they would not be required 'to make any payments on their indebtedness, either interest or principal, until this money came in from the 1932 crop of lettuce seed . . . .' " (*Id.* at p. 263.) The court held that the parol evidence rule precluded proof of the alleged promissory fraud: "Our conception of the rule which permits parol evidence of fraud to establish the invalidity of the instrument is that it must tend to establish some independent fact or representation, some fraud in the procurement of the instrument or some breach of confidence concerning its use, and not a promise directly at variance with the promise of the writing." (*Ibid.*)

The holding of the *Pendergrass* decision received a slightly different verbal formulation in *Bank of America* v. *Lamb Finance Co.* (1960) 179 Cal.App.2d 498 [3 Cal.Rptr. 877]. The plaintiff offered to prove that the bank fraudulently promised her that, contrary to the written terms of the instrument, she would not be personally liable on a guaranty she signed in the capacity of sole shareholder and officer of a corporation. Relying on *Pendergrass,* the court barred proof of the alleged promissory fraud: "A distinction has been made by our courts in cases in which the fraud sought to be proved consists of a false promise. They have held that if, to induce one to enter into an agreement, a party makes an independent promise without intention of performing it, this separate false promise constitutes fraud which may be proven to nullify the main agreement; but if the false promise relates to the matter covered by the main agreement and contradicts or varies the terms thereof, any evidence of the false promise directly violates the parol evidence rule and is inadmissible." (*Id.* at p. 502; see also *Shyvers* v. *Mitchell* (1955) 133 Cal.App.2d 569, 573 [284 P.2d 826]; *Cobbs* v. *Cobbs* (1942) 53 Cal.App.2d 780 [128 P.2d 373].)

The *Pendergrass* decision has been severely criticized by scholarly commentators. (*Parol Evidence: Admissibility to Show that a Promise was Made Without Intention to Perform It* (1950) 38 Cal.L.Rev. 535-539; Sweet, *Promissory Fraud and the Parol Evidence Rule* (1961) 49 Cal.L.Rev. 877-907.) While applying the decision, the court in *Coast Bank* v. *Holmes* (1971) 19 Cal.App.3d 581, 591 [97 Cal.Rptr. 30], termed the *Pendergrass* distinction between different forms of promissory fraud as being "tenuous" and "inconsistent" with tort principles. The court opined, "[t]he recent decisions liberalizing the parol evidence rule cast some doubt on the continued vitality of the distinction." (*Id.* at p. 592; see also *Glendale Fed. Sav. & Loan Assn.* v.

*Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101, 161 [135 Cal.Rptr. 802].)

We must accept *Pendergrass,* however, as the governing law. The first (and sufficient) reason is that, since the decision has never been overruled, it may not be challenged by an appellate court. (9 Witkin, Cal. Procedure (3d ed. 1985) § 768, p. 735.) The landmark decisions of the 1960's liberalizing the parol evidence rule have only oblique relevance to *Pendergrass* and cannot be read as overruling the decision. (*Masterson* v. *Sine* (1968) 68 Cal.2d 222 [65 Cal.Rptr. 545, 436 P.2d 561]; *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373]; and *Delta Dynamics, Inc.* v. *Arioto* (1968) 69 Cal.2d 525 [72 Cal.Rptr. 785, 446 P.2d 785].) Moreover, despite scholarly criticisms, the decision is based on an entirely defensible decision favoring the policy considerations underlying the parol evidence rule over those supporting a fraud cause of action.

The scholarly commentators correctly point out that there is no conceptual inconsistency between promissory fraud and the parol evidence rule. Promissory fraud requires a showing of tortious intent and reliance in addition to proof of an oral promise; the parol evidence rule is concerned only with proof of an oral promise. The two legal concepts can logically coexist. The policy considerations underlying promissory fraud apply fully when the promise relates to the main terms of the agreement. By limiting promissory fraud to promises relating to collateral matters, not at variance with the principal obligations, *Pendergrass* compromises the objectives of tort law in a manner that is not strictly necessary to give effect to the parol evidence rule.

On the other hand, if loosely construed, the concept of promissory fraud may encourage attempts to convert contractual disputes into litigation over alleged fraud. To be sure, fraud requires proof of the additional elements of intent and reliance. But these can so easily be inferred from any broken promise that promissory fraud may in fact open the door to attempts to enforce oral promises through tort causes of action under the guise of a promise made without intention to perform. A broad doctrine of promissory fraud may allow parties to litigate disputes over the meaning of contract terms armed with an arsenal of tort remedies inappropriate to the resolution of commercial disputes. Thus, the practical impact of alleged promissory fraud may in fact undermine the policies of the parol evidence rule.

In short, *Pendergrass* compromises the policies of tort law, but a contrary rule would compromise those of the parol evidence rule. How one weighs the conflicting considerations will depend largely on the importance one attaches to the respective policies. In *Pendergrass,* the Supreme Court gave

priority to the policies of the parol evidence rule. While the decision was by no means logically inevitable, it represents a rational policy choice that should be reconsidered only by the Supreme Court itself.

■ *Pendergrass* may be easily applied to the present case. The promissory note for the mobilehome loan bears the apparent marks of an integrated agreement, and appellants have advanced no contrary argument. The alleged oral promise that Wells Fargo would beat the terms of Bank of America constitutes a "contemporaneous oral agreement," contradicting the terms of the written agreement which comes within the terms of the parol evidence rule. (Code Civ. Proc., § 1856; 2 Witkin, Cal. Evidence, *supra,* § 960 et seq., p. 908.)

■ As further tort theories, appellants charge Wells Fargo with intentional and negligent infliction of emotional distress. The foregoing analysis is, however, fatal to these claims. Our conclusion that Wells Fargo did not defraud appellants or breach the implied covenant of good faith and fair dealing necessarily implies that it did not engage in the sort of "outrageous" conduct necessary to incur liability for intentional infliction of emotional distress. (5 Witkin, Summary of Cal. Law (9th ed. 1988) § 404, p. 484.) Again, our conclusion that there was no breach of the implied covenant of good faith and fair dealing appears to preclude liability for negligent infliction of emotional distress; appellants have not proposed any duty owed to appellants that does not fall within the implied covenant theory. (6 Witkin, Summary of Cal. Law (9th ed. 1988) § 838, p. 194.)

■ To support their three posttrial motions—the motion for reconsideration, the motion for new trial, and motion for relief under Code of Civil Procedure section 473—appellants submitted certain materials that were not included in their opposition to the motion for summary judgment, including excerpts from the depositions of Stephen Schendel and John Richards and declarations of appellants. The trial court overruled the objections of Wells Fargo to this new material but still denied the motions. On appeal, appellants urge that the new material should have compelled a different ruling on the motion for summary judgment.

For purpose of analysis, our discussion of the implied covenant of good faith and fair dealing has in fact included relevant material from the Richards's deposition and the appellants' declarations. This material did not affect our conclusion that the summary judgment was proper. The deposition of Stephen Schendel contains certain observations regarding the parties' expectation that the loan agreements would be renewed. But the testimony has no relevance to the actual allegations of the complaint relating to fraud since it does not serve to prove any actionable misrepresentation. The

testimony also has little bearing on the theories of liability based on the implied covenant of good faith; appellants do not argue that the implied covenant required Wells Fargo to renew the loan agreement. The other portions of Schendel's testimony cited in the motions—relating to "mutual trust" residing in the bank/customer relationship and the impropriety of a bank official informing a customer that he will deny making a statement— have little materiality.

As a final assignment of error, appellants point out that the trial court granted the motion for summary adjudication of the issues as well as the motion for summary judgment. Code of Civil Procedure section 437c, subdivision (f), provides: "[a] party may move for summary adjudication of issues, either by itself or as an *alternative* to summary judgment." (Italics added.) This anomalous result apparently occurred because the trial court first announced on August 28, 1987, a tentative ruling to summarily adjudicate various issues but to deny summary judgment as to Wells Fargo. Later, on September 18, 1987, the court decided to grant summary judgment as to the bank. However, the orders ultimately signed included the list of summarily adjudicated issues. We agree that the summary adjudication of issues was unnecessary, but appellants were not prejudiced by it. In this appeal, they cannot base any grievance on this superfluous order.[4]

The judgment is affirmed.

Holmdahl, J., and Stein, J., concurred.

A petition for a rehearing was denied September 21, 1989, and appellants' petition for review by the Supreme Court was denied December 7, 1989.

---

[4] Because of our affirmance of the summary judgment, we do not reach appellant's assignments of error relating to the summary adjudication of issues.