Filed 3/16/22  Shayesteh v. Welch CA4/1
# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA


| | |
|---|---|
| MINOO SHAYESTEH, | D079462 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 2015-1-CV-282358) |
| NAGIN WELCH, | |
| Defendant and Respondent. | |


APPEAL from a judgment of the Superior Court of Santa Clara, Sunil R. Kulkarni, Judge.  Affirmed.

The Law Offices of John H. Perrott and John Henry Perrott for Plaintiff and Appellant.

Jensen & McDonald and Edward C. McDonald for Defendant and Respondent.

Sisters Minoo Shayesteh and Nagin Welch dispute the ownership of property located at 240 North Cypress Avenue, in Santa Clara, California.  Shayesteh maintains she and her sister provided equal funds for the down payment and that they both contributed to the mortgage, property taxes, and maintenance.  She filed suit in 2015 to quiet title, among other things.  Welch

denied Shayesteh's allegations, and the matter went to trial in 2018. Shayesteh sought to introduce recordings she had made of conversations with her sister about the property. The court excluded one such recording made November 21, 2013 after concluding it regarded settlement negotiations and was inadmissible under Evidence Code[1] section 1152, subdivision (a) for purposes of proving liability. Following trial, the court entered judgment in favor of Welch. Shayesteh appeals the judgment, contending the court erred by excluding the November 21, 2013 recording. We conclude the trial court properly excluded the evidence, and we will affirm.

## I.

## BACKGROUND AND PROCEDURAL FACTS

Shayesteh and Welch are sisters who immigrated to the United States in the late 1970s. Both women married.

Shayesteh eventually divorced her husband in 2009 after they were separated for many years. In the early 2000s, Shayesteh feared her husband would somehow take any money she had, even after they were separated, so she looked for a safe place to hide the money. She asked her sister Welch to safeguard or invest the money in real estate on Shayesteh's behalf. Shayesteh testified that she gave Welch $1,500 each month for safekeeping between 2001 and 2004. She also testified that she gave income tax refunds and child support payments to Welch, and that the funds added up to about $100,000.

In 2004, Welch and her husband Timothy[2] purchased 240 North Cypress Avenue, Santa Clara, California as an investment property.[3] Welch

---

[1]     Further section references are to the Evidence Code.
[2]     We refer to Timothy Welch by his first name to avoid confusion.

paid the down payment from her separate money. The house was titled to Welch and Timothy as joint tenants; Shayesteh was not named on the deed but believed her name would be added when Timothy eventually quitclaimed it. Timothy removed his name from the title around 2005 and confirmed the removal through a quitclaim deed in 2008, around the time that he and Welch divorced.[4]

Welch rented out the Cypress house beginning in March 2005. Shayesteh testified that the rent Welch collected did not cover the mortgage and other expenses, and Shayesteh paid Welch $300 per month, in cash, to make up the shortfall. Welch testified that there generally were no shortfalls, and when they occurred, she covered the difference from her own bank account.

Shayesteh moved into the Cypress house in October or November 2008. She testified that she paid $2,520[5] per month, and this money was her share of the mortgage. She also testified that she paid all the property taxes on the home beginning in 2004. Welch testified that Shayesteh originally paid rent without being asked to do so, and they eventually signed a lease agreement. Shayesteh asserted her signature on the lease agreement was forged.

In November 2011, Welch moved into the Cypress house with Shayesteh. Shayesteh testified that she continued to contribute to the

---

[3]     In some places in the record, the address is listed as located in San Jose rather than Santa Clara. The recorded deed identifies the address as 240 North Cypress Avenue, Santa Clara, California, Santa Clara County.

[4]     The record on appeal does not include a copy of the quitclaim deed, and neither party alleges Shayesteh's name was added when Timothy filed the quitclaim deed in 2008.

[5]     She also testified that $1,000 of the $2,520 was paid to her by a tenant and one of her adult children who was living there at the time.

mortgage and taxes by paying Welch each month. Welch characterized the money as rent and expense payments. Welch also testified that she paid all the property taxes for the Cypress property from 2005 to the present.

Eventually, in 2015, Welch sued Shayesteh for unlawful detainer. In that proceeding, Shayesteh argued she was an actual owner, she had not been served with an eviction, and the signature on the lease was not hers. The court entered an eviction judgment against Shayesteh on July 1, 2015. It determined Welch was entitled to possession of the Cypress home.

Shayesteh filed a verified complaint against Welch on June 26, 2015. The complaint sought to quiet title on the Cypress property. It alleged the sisters had an agreement for joint, equal ownership of the property. The complaint also included claims for abuse of process, malicious prosecution, deed procured by undue influence, constructive trust, intentional infliction of emotional distress, breach of contract as a third party beneficiary, common counts - money had and received, tortious assault, premises liability, and fraud.

The case proceeded to trial.

*The November 21, 2013 Recording*

Welch filed a motion in limine to exclude an audio recording and transcript from a meeting that took place November 21, 2013. She argued the recording was made without her consent and was privileged because it was a settlement discussion between the parties. Shayesteh argued the recording was relevant to toll the statute of limitations for the fraud claim.

The trial court provisionally admitted Exhibits 44 and 55, the recording and a transcript of the recording, and it heard testimony about the meeting.

4

There were four people present at the meeting: Shayesteh, Welch, their brother Abbas Shayesteh, and their cousin Behrouz Shayesteh.[6] Shayesteh testified that she held up her phone and asked the three present if she could record, and they responded, "Yeah." Shayesteh acknowledged that there was no clear statement from Welch, but also reported that Welch did not decline. Abbas testified that Shayesteh asked if she could record the meeting and those present said it was okay.

Shayesteh testified that they "were going through these meetings back and forth" and "this time" it looked like Welch "really want[ed] it to be really happening." Shayesteh believed Welch wanted her to vacate the property and "wanted to give [me my] money—some money." Shayesteh told the court she wanted Welch to pay her $250,000, but that day she agreed to a smaller amount because they were not going near that number. She said the meeting resulted in a completed deal.

Abbas testified that he participated in the meeting to help fix the problem between the sisters; his purpose was to make peace, and he hoped that Welch would write a check to Shayesteh. He also said the dollar amount the parties agreed to was part of a negotiation between the parties that may or may not have related to what Shayesteh actually paid. He said the November 2013 agreement was a second attempt to make peace between the sisters. He also explained that the agreement did not say anything about who had legal title to the property because Welch would not sign the document with more detail than it had.

When the court asked Shayesteh whether, if everyone had done what they were supposed to do according to the agreement that came out of that

---

[6]    Because Abbas and Behrouz share a surname with Minoo Shayesteh, we refer to them by their first names for clarity.

meeting, there would be no more disputes about the house or the title, she said "That's right." Cousin Behrouz also thought the November 2103 agreement settled everything; he expected Welch to write a check to Shayesteh and for Shayesteh to move out.

Welch testified that the agreement was a 60-day notice, and if Welch gave Shayesteh back all the rent Shayesteh had paid, Shayesteh would move out. Welch said she agreed to it because she loved Shayesteh's children and did not want to cause problems. Welch did not pay the money because she never saw Shayesteh packing; she thought Shayesteh did not really want to move out, and after the meeting, Shayesteh did not ask to move out.

The court explained that whether Welch consented to the recording was an issue for the factfinder to determine, so it would not exclude the recording on that basis.

Then, in its statement of decision, the court found that Welch consented to the November 21, 2013 recording.

However, the court concluded the recording was inadmissible under section 1152 subdivision (a) because it contained settlement discussions. The court explained that Shayesteh had testified that the relevance of the recording was Welch's admission therein that she had a substantial amount of Shayesteh's money. Because that was directly related to Welch's liability, it was inadmissible. It also ruled that testimony regarding the substance of the meeting was inadmissible for the same reason. Although the court recognized that the recording could be admitted under the parol evidence rule to help determine the intended meaning of the language in the November 21, 2013 settlement agreement, because neither party contended the agreement was ambiguous, it was not admitting it for that purpose.

6

*April 2014 Recording*

Shayesteh also introduced a recording she made April 16, 2014. In that recording, Welch can be heard saying to Shayesteh, "[Y]ou have only $55,000 only with me. . . ." Although the court determined the recording was made illegally, it considered the recorded conversation for impeachment purposes.

*Additional Evidence*

At trial, Shayesteh and Welch offered evidence to explain where their contributions to the down payment came from. Shayesteh also introduced several documents she claimed were signed by Welch that indicated Welch had agreed to add Shayesteh's name to the deed. Welch denied signing the documents, and a handwriting expert could not verify the signatures were hers.

Family members and friends testified that it was their understanding that the Cypress property was owned by Shayesteh and Welch. None of them had seen any documentation to support this understanding. The court found the witnesses to be biased.

The court admitted a document provided to the County of Santa Clara regarding Medi-Cal benefits that Shayesteh signed in 2006 under penalty of perjury. It stated that she did not own any property.

The court found in favor of Welch on all asserted claims and entered judgment against Shayesteh.

Shayesteh timely appealed.

## II.

## DISCUSSION

We begin by commenting that we presume the judgment is correct, and it is the appellant's burden to affirmatively demonstrate error. (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609.) An appeal is not a second trial, so to

7

the extent we are called upon to review factual findings, we apply a substantial evidence standard of review; we do not reweigh evidence. (*Curcio v. Pels* (2020) 47 Cal.App.5th 1, 12.)  We also "resolve all factual conflicts and questions of credibility" in favor of the prevailing party. (*Schild v. Rubin* (1991) 232 Cal.App.3d 755, 762.)

The issue before us here is whether the court properly excluded evidence.  We review the admissibility of evidence, including evidence excluded under section 1152, subdivision (a), for an abuse of discretion. (*Mangano v. Verity, Inc.* (2009) 179 Cal.App.4th 217, 222 (*Mangano*); *Zhou v. Unisource Worldwide* (2007) 157 Cal.App.4th 1471, 1476 (*Zhou*); *Caira v. Offner* (2005) 126 Cal.App.4th 12, 32 (*Caira*).)  In so doing, we ask whether the trial court's application of the law to the facts of the case was arbitrary and capricious.  (*In re Charlisse C.* (2008) 45 Cal.4th 145, 159.)

"Evidence that a person has, in compromise or from humanitarian motives, furnished or offered or promised to furnish money or any other thing, act, or service to another who has sustained or will sustain or claims that he or she has sustained or will sustain loss or damage, as well as any conduct or statements made in negotiation thereof, is inadmissible to prove his or her liability for the loss or damage or any part of it."  (§ 1152, subd. (a); see *Caira, supra*, 126 Cal.App.4th at p. 30; *Hasler v. Howard* (2004) 120 Cal.App.4th 1023, 1026.)  The exclusion applies broadly and includes the offers as well as any statements made in the course of settlement negotiations.  (§ 1152; *C & K Engineering Contractors v. Amber Steel Co.* (1978) 23 Cal.3d 1, 13; *Caira*, at pp. 32-33; *Zhou, supra*, 157 Cal.App.4th at p. 1475.)  Although statements made during settlement negotiations cannot be used to prove liability (*C & K Engineering*, at p. 13), such statements may be used for other, limited purposes (*Truestone, Inc. v. Simi West Indus. Park*

8

*II* (1984) 163 Cal.App.3d 715, 725 [offer to settle different lawsuit admissible as statement against interest independent of compromise offer]), including to impeach a defendant's contrary testimony on direct examination (see, e.g., *People v. Crow* (1994) 28 Cal.App.4th 440, 450-451).

Shayesteh challenges the court's exclusion of four exhibits[7] and focuses on its decision to exclude them under section 1152. She first argues the November 21, 2013 meeting was not a settlement negotiation subject to section 1152 because litigation had not begun at the time of the meeting.

This view has been rejected by the court in *Mangano*. There, the court considered section 1152 in the context of a wrongful employment termination suit. Mangano sought to admit evidence of a proposed separation agreement as evidence of defendant Verity's liability. (*Mangano, supra*, 179 Cal.App.4th at pp. 222-223.) Mangano argued that "any dispute about [his] termination . . . had not yet arisen at the time of the proposed separation agreement," and the agreement therefore was not subject to section 1152. (*Mangano*, at pp. 222-223.) The appellate court disagreed, explaining nothing in section 1152 limits its application to offers to compromise preexisting disputes. (*Mangano*, at pp. 222-223.)

The plain language of section 1152 makes clear that an offer "in compromise or from humanitarian motives . . . to furnish money . . . as well as any conduct or statements made in negotiation thereof . . . is inadmissible

---

7 Exhibits 21, 48, and 55 are transcripts of the conversation that occurred November 21, 2013. The court replaced Exhibits 21 and 48 with Exhibit 55 because Exhibit 55 was transcribed by a court interpreter rather than one of the parties. The court provisionally admitted Exhibit 55, the transcript by the interpreter, subject to Welch's objections regarding consent and section 1152. Exhibit 44 was the audio recording of the November 21, 2013 meeting, during which participants spoke in English and Farsi. The court provisionally admitted it, subject to Welch's objections. Shayesteh did not lodge a copy of the recording with the appellate court.

9

to prove his or her liability for the loss." (§ 1152, subd. (a).) The court here explored the purpose of the November 21, 2013 meeting and concluded it was a settlement negotiation. This conclusion is well-supported by the record.

Although the existence of a dispute at the time of an offer of compromise is not a prerequisite to applying section 1152 (see *Mangano*, *supra*, 179 Cal.App.4th at pp. 222-223), here a dispute predated the November meeting. Shayesteh testified that they had been going through meetings back and forth, and although she wanted Welch to pay her $250,000, they agreed to a smaller amount. This indicates the parties had a dispute, and they negotiated and compromised to reach a final agreement, subjecting the substance of the meeting to section 1152.

Abbas's testimony, like Shayesteh's, reflected the existence of a dispute. He testified that he participated in the meeting to fix a problem and make peace. This was his second attempt to make peace between his sisters, showing that their dispute predated the meeting. He also explained that the dollar amount they agreed to in the final agreement was negotiated and may or may not have related to money Shayesteh actually paid Welch, further indicating some sort of compromise and negotiation had occurred.

Their cousin's testimony similarly acknowledged a dispute had predated the November meeting because he believed the agreement resulting from the meeting settled everything.

Welch's testimony also supports the court's conclusion. She testified that she did not owe Shayesteh any money, but she agreed to pay Shayesteh because she loved Shayesteh's children and did not want to cause problems. Her testimony suggests she promised money from more humanitarian motives, understanding her sister would sustain the loss of housing. Although she paints her motives as humanitarian rather than as a

10

negotiated settlement, her explanation nonetheless supports the exclusion of evidence about the meeting's substance to establish liability under section 1152.  (See § 1152.)

Taken together, the evidence indicates the meeting was held to address a conflict or dispute between the sisters or that the offer to pay came from some humanitarian motive regarding a future loss of housing.  Therefore, the court's application of section 1152 was appropriate.

The case law Shayesteh cites to support her position that the parties must be engaged in active litigation for section 1152 to apply is not helpful.  In *Preciado v. Wilde* (2006) 139 Cal.App.4th 321 (*Preciado*), the Preciados and Wilde were tenants in common.  (*Id.* at p. 323.)  In a suit to quiet title, the Preciados attempted to demonstrate adverse possession, but Wilde testified "she had no notice that the Preciados wanted to interfere with her right to possession and title." (*Id.* at p. 325.)  At trial, Wilde introduced evidence of a letter in which the Preciados offered to buy her interest.  (*Id.* at p. 326.)  On appeal, the Preciados argued it was error to admit the letter because the letter was an offer to compromise.  (*Ibid.*)  But the court of appeal concluded that section 1152 was inapplicable because there were no discussions to settle any dispute over ownership; the offer was simply a buy-out offer.  (*Preciado*, at p. 326.)

*Preciado* cites to *Price v. Wells Fargo Bank* (1989) 213 Cal.App.3d 465 (*Price*).  In *Price*, the parties entered a series of loan agreements.  The Prices conceded they never disputed the demands for payment or the amounts of money they owed, and they made payments of interest and principal without contesting their obligations.  (*Id.* at 480.)  On appeal, they argued the court should have excluded letters from the Prices' attorney asking the bank to hold off on demanding payment to allow for a less catastrophic solution.  (*Id.*

11

at p. 481 & fn 3.)  But the appellate court found nothing in the record to suggest the parties disputed the existence or even the terms of the loan; the letters themselves disclosed there was no dispute.  (*Id.* at p. 481, fn. 3.)

Neither of these cases held that active litigation was necessary to find the existence of a dispute.  The courts in those cases simply concluded the parties involved were "not engaged in discussions to settle a dispute about ownership."  (*Preciado, supra,* 139 Cal.App.4th at p. 326; see *Price*, at p. 481, fn. 3.)  And although Shayesteh attempts to compare her situation to the one in *Preciado,* her attempt falls short.  In her reply brief, Shayesteh argues there was no evidence of a dispute between her and Welch; the November 21, 2013 communication was a buy-out.  But this claim is contradicted in the record, as we discussed *ante.*  There was ample evidence for the court to conclude there was a "longstanding dispute" between the sisters that justified its application of section 1152 here.

Shayesteh makes several additional arguments for why the court should have admitted the substance of the November 21, 2013 meeting, none of which has merit.  She contends that an offer of compromise proposed as impeachment evidence would always swallow the prohibition on admitting the substance of settlement discussions, effectively voiding section 1152.

Whether this is theoretically true was not tested here because Shayesteh did not ask to introduce the recording as impeachment evidence. Thus, this issue is not before us.[8]

Shayesteh argues the court acted inconsistently because it admitted the recording made in April 2014 without Welch's consent, but it excluded the consented-to recording from November 2013. However, this argument ignores the court's rationale and conflates consent with other requirements for admissibility. After explaining that the question of consent was one of fact, the court, in its factfinding capacity, concluded Welch consented to the November 21, 2013 recording. This meant the court could admit the recording as substantive evidence in the absence of some other rule precluding it. But because the court also concluded the communication was a settlement negotiation, it excluded the 2013 recording under section 1152. In contrast, Welch did not consent to being recorded in 2014, which meant the court could not admit the contents as substantive evidence. Instead, the court considered the recording as potential impeachment evidence. The 2014 recording differed from the 2013 recording both because section 1152 was not implicated, and because it was admitted for impeachment purposes. There was no inconsistency.

---

[8] Shayesteh also argues that the court elevated the policy underlying section 1152 above the policy prohibiting perjury. Shayesteh did not request the admission of the recording for the purpose of impeaching Welch. Had she done so, the court could have contemplated Welch's statements during that meeting as evidence challenging her credibility without treating them expressly as true (or false). This is how the court handled the admission of a recording made April 16, 2014; it explained that the recording was not admissible as substantive evidence because it was not legally made, but it could be used for impeachment.

Shayesteh next argues that because Welch consented to being recorded, she should be estopped from "conceal[ing] the truth" of what she said during the conversation. But Welch's consent to being recorded did not waive her right to later object to the admission of the evidence in court under section 1152. Shayesteh does not explain why it would have.

Finally, Shayesteh argues that the November 2013 recording contains proof of fraud because it evidences a false promise of compromise and therefore should have been admitted. Her theory is that the recording from November 2013 demonstrates the settlement communication was an insincere settlement overture designed to discourage her from suing. But, again, evidence in the record contradicts this view.

Shayesteh testified that it seemed like Welch really wanted them to come to an agreement on November 21, 2013. And she believed Welch wanted to give her money in exchange for vacating the property. She told the court their final agreement that day was a completed deal, and if everyone had done what they were supposed to, there would be no more disputes about the Cypress property. Behrouz likewise told the court he expected Welch to write a check to Shayesteh and Shayesteh to move out. Even Welch intimated that she believed the agreement was a 60-day notice and if she returned rent to Shayesteh, Shayesteh would move out. Her lack of payment was not the result of insincerity on her part, but because she perceived Shayesteh's inaction to indicate Shayesteh did not want to follow through with their agreement. In other words, there is evidence to support the court's conclusion that this was not a situation where there was promissory fraud.[9]

---

9   Shayesteh did not claim fraud regarding the executed settlement that resulted from the November 21, 2013 meeting.

14

DISPOSITION

The judgment is affirmed.  Welch is entitled to her costs on appeal.


HUFFMAN, J.

WE CONCUR:


McCONNELL, P. J.


DO, J.

15