[No. F060922. Fifth Dist. Oct. 28, 2011.]

DAVID DUNCAN et al., Plaintiffs and Appellants, v.
THE McCAFFREY GROUP, INC., et al., Defendants and Respondents.

COUNSEL

Law Offices of Keith C. Rickelman, Keith C. Rickelman; Law Offices of Sara Hedgpeth-Harris and Sara Hedgpeth-Harris for Plaintiffs and Appellants.

Cooley, Patrick P. Gunn and Charles M. Schaible for Defendants and Respondents.

OPINION

**CORNELL, J.**—Plaintiffs David Duncan, Lynne Y. Duncan, Michael V. Fillebrown, Gerald Lung, Jeannie Lung, the Lung Family Revocable Trust, Richard Marino, Angela Marino, Weldon K. Schapansky, individually and as the sole beneficiary of the Grabe, Schapansky, Moss, Levy & Julian DDS PC 401 Retirement Plan, Noah Sever, Linda Washington, Carl D. West, and Chung C. Faulkner (hereafter collectively, plaintiffs) appeal from the judgment entered after the trial court sustained the demurrers filed by defendants The McCaffrey Group, Inc., McCaffrey Home Realty, Robert A. McCaffrey, McCaffrey Development LP, Bullard Grantland No. 1, Inc., and Ron Pottorff (hereafter collectively, defendants)[1] to plaintiffs' sixth amended complaint.

Defendants are the developers of a tract of land marketed as the Treviso Custom Home Development (hereafter the Development). Plaintiffs are individuals who purchased lots from defendants with the intent to build custom homes on each lot, with some having completed construction on their homes.

The complaint alleged, in essence, that plaintiffs paid a premium price for their lots because the Development was marketed as one that would be limited to custom homes with at least 2,700 square feet of living space. Plaintiffs alleged that, unbeknownst to them, defendants at all times intended to build tract homes on some of the lots that would be much smaller than 2,700 square feet of living space. As a result of the construction of smaller tract homes, plaintiffs alleged the value of their lots plummeted.

In the various versions of their complaint, plaintiffs have alleged numerous causes of action attributable to the purchase of the lots. As we understand plaintiffs' argument, they contend only that the trial court erred in sustaining the demurrer to their causes of action for alleged unfair competition, in violation of Business and Professions Code section 17200, false advertising, in violation of Business and Professions Code section 17500, and fraud. In

---

[1] The demurrer was sustained with leave to amend. Plaintiffs chose not to amend and allow judgment to be entered to permit an appeal from the ruling.

addition, plaintiffs challenge the trial court's order granting defendants' motion for summary adjudication on their causes of action for breach of fiduciary duty and constructive fraud.

The primary basis for the trial court's order sustaining defendants' demurrers was that the parol evidence rule precluded any testimony about facts inconsistent with the contract between the parties and the purchase and sale agreement (hereafter the Agreement) and therefore there was no factual basis for any of plaintiffs' claims. As we shall explain, the trial court was correct that the fraud cause of action lacked any factual support because the parol evidence rule precluded the evidence on which plaintiffs relied. The trial court erred, however, in sustaining the demurrer to the causes of action for false advertising and unfair competition because the allegations on which plaintiffs relied were not offered to vary, alter, or add to the terms of the Agreement, and thus the parol evidence rule was inapplicable.

We also conclude the trial court erred in granting the motion for summary adjudication. Plaintiffs alleged that defendant McCaffrey Home Realty acted as their real estate agent in the purchase transaction and therefore owed them a fiduciary duty, which was breached by various acts of defendants. The trial court concluded that the Agreement established that defendant McCaffrey Home Realty acted as a broker only for defendants and therefore there was no fiduciary relationship between plaintiffs and defendants. As we shall explain, we conclude the Agreement was ambiguous and therefore a triable issue of fact exists as to the meaning of the contract, which may require extrinsic evidence to resolve. Therefore, the order granting summary adjudication also must be reversed.

## FACTUAL AND PROCEDURAL SUMMARY

*Sixth Amended Complaint*

We begin with the sixth amended complaint (SAC) because that was the operative pleading at the time judgment was entered. As relevant to the issues we must decide, the SAC alleged plaintiffs were the owners of lots in the Development. The lots were purchased between July 28, 2006, and August 8, 2007. Defendants were corporate entities or partnerships doing business in the state of California, primarily the development, construction, and sale of new residential homes, except for Ron Pottorff, who was an employee of defendants.

Plaintiffs' first cause of action alleged defendants committed acts of unfair competition, in violation of Business and Professions Code section 17200. According to plaintiffs, defendants authored and·caused to be recorded a

declaration of covenants, conditions, and restrictions (CC&R's) applicable to the Development. As initially recorded, and at the time plaintiffs bought their lots, the CC&R's required each home built within the Development to be at least 2,700 square feet and "architecturally compatible with each other."

In addition, Pottorff told plaintiffs Richard Marino and Angela Marino that the Development contained the only custom home lots in that area. The sales office for the Development exhibited numerous pictures and architectural plans for custom homes built at defendants' other developments and that were similar to the Development's.

After each plaintiff had purchased his or her lot, defendants, without notice, caused the CC&R's to be amended to reduce the minimum size of each residence built in the Development to 1,700 square feet. Approximately one month later, defendants caused the CC&R's to be amended a second time without notice, this time reducing the minimum size of a residence built in the Development to 1,400 square feet.

After each plaintiff had purchased his or her lot, defendants began selling tract homes on lots within the Development. The price for some of these tract homes was essentially the same as the price paid by plaintiffs for their undeveloped lots. As a result of defendants' construction of tract homes, the Development no longer was a custom home development. Defendant Robert A. McCaffrey admitted to plaintiffs that the Development never was intended to be limited to custom homes.

These actions allegedly violated Civil Code sections 1567[2] (freedom of consent), 1572[3] (fraud), 1573[4] (constructive fraud), 1575[5] (undue influence),

---

[2] Civil Code section 1567 states: "An apparent consent is not real or free when obtained through: [¶] 1. Duress; [¶] 2. Menace; [¶] 3. Fraud; [¶] 4. Undue influence; or [¶] 5. Mistake."

[3] Civil Code section 1572 states: "Actual fraud, within the meaning of this Chapter, consists in any of the following acts, committed by a party to the contract, or with his connivance, with intent to deceive another party thereto, or to induce him to enter into the contract: [¶] 1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true; [¶] 2. The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true; [¶] 3. The suppression of that which is true, by one having knowledge or belief of the fact; [¶] 4. A promise made without any intention of performing it; or, [¶] 5. Any other act fitted to deceive."

[4] Civil Code section 1573 states: "Constructive fraud consists: [¶] 1. In any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or anyone claiming under him, by misleading another to his prejudice, or to the prejudice of anyone claiming under him; or, [¶] 2. In any such act or omission as the law specially declares to be fraudulent, without respect to actual fraud."

[5] Civil Code section 1575 states: "Undue influence consists: [¶] 1. In the use, by one in whom a confidence is reposed by another, or who holds a real or apparent authority over him, of such confidence or authority for the purpose of obtaining an unfair advantage over him; [¶]

$1667^6$ and $1668^7$ (contracts contrary to law), $1670.5^8$ (unconscionable contracts), $1709^9$ and $1710^{10}$ (deceit), and Business and Professions Code sections $11012^{11}$ (unlawful material change in setup), $11018.7^{12}$ (unlawful amendment

---

2. In taking an unfair advantage of another's weakness of mind; or, [¶] 3. In taking a grossly oppressive and unfair advantage of another's necessities or distress."

[6] Civil Code section 1667 states: "That is not lawful which is: [¶] 1. Contrary to an express provision of law; [¶] 2. Contrary to the policy of express law, though not expressly prohibited; or, [¶] 3. Otherwise contrary to good morals."

[7] Civil Code section 1668 states: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."

[8] Civil Code section 1670.5 states: "(a) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result. [¶] (b) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose, and effect to aid the court in making the determination."

[9] Civil Code section 1709 states: "One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."

[10] Civil Code section 1710 states: "A deceit, within the meaning of . . . section [1709], is either: [¶] 1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true; [¶] 2. The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true; [¶] 3. The suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or, [¶] 4. A promise, made without any intention of performing it."

[11] Business and Professions Code section 11012 states: "It is unlawful for the owner, his agent, or subdivider, of the project, after it is submitted to the Department of Real Estate, to materially change the setup of such offering without first notifying the Department of Real Estate in writing of such intended change. This section only applies to those changes of which the owner, his agent, or subdivider has knowledge or constructive knowledge."

[12] Business and Professions Code section 11018.7 states: "(a) No amendment or modification of provisions in the declaration of restrictions, bylaws, articles of incorporation or other instruments controlling or otherwise affecting rights to ownership, possession, or use of interests in subdivisions as defined in [Business and Professions Code] Sections 11000.1 and 11004.5 which would materially change those rights of an owner, either directly or as a member of an association of owners, is valid without the prior written consent of the Real Estate Commissioner during the period of time when the subdivider or his or her successor in interest holds or directly controls as many as one-fourth of the votes that may be cast to effect that change. [¶] (b) The commissioner shall not grant his or her consent to the submission of the proposed change to a vote of owners or members if he or she finds that the change if effected would create a new condition or circumstance that would form the basis for denial of a public report under [Business and Professions Code] Sections 11018 or 11018.5. [¶] An application for consent may be filed by any interested person on a form prescribed by the commissioner. A filing fee to be fixed by regulation, but not to exceed twenty-five dollars ($25), shall accompany each application. [¶] There shall be no official meeting of owners or members nor any written solicitation of them for the purpose of effectuating a change referred

of the CC&R's), 11019[13] (order prohibiting violations), 11022[14] (false or

to herein except in accordance with a procedure approved by the commissioner after the application for consent has been filed with him or her; provided, however, that the governing body of the owners association may meet and vote on the question of submission of the proposed change to the commissioner."

[13] Business and Professions Code section 11019 states: "(a) Whenever the commissioner determines from available evidence that a person has done any of the following, the commissioner may order the person to desist and refrain from those acts and omissions or from the further sale or lease of interests in the subdivision until the condition has been corrected: [¶] (1) Has violated or caused the violation of any provision of this part or the regulations pertaining thereto. [¶] (2) Has violated or caused a violation of [Business and Professions Code] Section 17537, 17537.1, or 17539.1, in advertising or promoting the sale of subdivision interests. [¶] (3) Has failed to fulfill representations or assurances with respect to the subdivision or the subdivision offering upon which the department relied in issuing a subdivision public report. [¶] (4) Has failed to inform the department of material changes that have occurred in the subdivision or subdivision offering which have caused the subdivision public report to be misleading or inaccurate or which would have caused the department to deny a public report if the conditions had existed at the time of issuance. [¶] (b) Upon receipt of such an order, the person or persons to whom the order is directed shall immediately discontinue activities in accordance with the terms of the order. [¶] (c) Any person to whom the order is directed may, within 30 days after service thereof upon him, file with the commissioner a written request for hearing to contest the order. The commissioner shall after receipt of a request for hearing assign the matter to the Office of Administrative Hearings to conduct a hearing for findings of fact and determinations of the issues set forth in the order. If the hearing is not commenced within 15 days after receipt of the request for hearing, or on the date to which continued with the agreement of the person requesting the hearing, or if the decision of the commissioner is not rendered within 30 days after completion of the hearing, the order shall be deemed to be vacated. [¶] (d) Service and proof of service of an order issued by the commissioner pursuant to this section may be made in a manner and upon such persons as prescribed for the service of summons in Article 3 (commencing with Section 415.10), Article 4 (commencing with Section 416.10) and Article 5 (commencing with Section 417.10) of Chapter 4 of Title 5 of Part 2, of the Code of Civil Procedure."

[14] Business and Professions Code section 11022 states: "(a) It is unlawful for an owner, subdivider, agent or employee of a subdivision or other person, with intent directly or indirectly to sell or lease subdivided lands or lots or parcels therein, to authorize, use, direct, or aid in the publication, distribution, or circularization of an advertisement, radio broadcast, or telecast concerning subdivided lands, that contains a statement, pictorial representation, or sketch that is false or misleading. [¶] (b) An owner, subdivider, agent, or employee of an owner or subdivider may, prior to the use, publication, distribution, or circulation of any advertisement concerning subdivided lands, submit the same to the department for approval. The submission shall be accompanied by a fee of not more than seventy-five dollars ($75). The commissioner shall prescribe by regulation the amount of the fee. [¶] If disapproval of the proposed advertisement is not communicated by the department to the owner, subdivider, agent, or employee within 15 calendar days after receipt of the copy of the proposed advertisement, the advertisement shall be deemed approved, but the department shall not be estopped from disapproving a later distribution, circulation, or use of the same or similar advertising. [¶] (c) Nothing in this section shall be construed to hold the publisher or employee of any newspaper, or any job printer, or any broadcaster, or telecaster, or any magazine publisher, or any of the employees thereof, liable for any publication herein referred to unless the publisher, employee, or printer has actual knowledge of the falsity thereof or has an interest either as an owner or agent in the subdivided lands so advertised."

misleading advertising), and 17530[15] (misleading publications). The SAC alleged that these statutory violations constituted unlawful business acts within the meaning of Business and Professions Code section 17200 et seq., the unfair competition law (UCL). Because plaintiffs actually and reasonably relied on defendants' representations, defendants' acts also constituted fraudulent business practices within the meaning of the UCL and false advertising within the meaning of Business and Professions Code sections 11022, 17200, and 17500. Finally, the SAC alleged that each plaintiff was damaged as a result of defendants' unlawful conduct.

The second cause of action sought rescission and restitution because defendants failed to notify the Real Estate Commissioner of the amendments to the CC&R's as required by Business and Professions Code sections 11012, 11018.7, and 11019. In addition, defendants allegedly violated Business and Professions Code sections 11012, 11018.7, 11019, and 11022 by building and marketing a limited number of models of tract homes. Plaintiffs also alleged the tract homes were not reviewed by the architectural control committee, as required by the CC&R's. These facts allegedly constituted a material change in the Development without notice to the Department of Real Estate, resulting in violation of the identified code sections entitling plaintiffs to rescission and restitution.

The third cause of action (false advertising) alleged that defendants falsely advertised the Development as limited to custom homes with the intent to induce plaintiffs to purchase lots, in violation of Business and Professions Code section 11022, subdivision (a). As a result of defendants' conduct, plaintiffs each suffered substantial damages.

The fourth cause of action (trespass) alleged that defendants trespassed on the lots owned by plaintiffs Lung, Marino, Schapansky, and Washington, causing damage to the lots and decreasing their value.

### Defendants' Demurrer to the SAC

In response to the SAC, defendants, as they had to each preceding complaint, filed a demurrer and motion to strike certain portions of the

---

[15] Business and Professions Code section 17530 states: "It is unlawful for any person, firm, corporation, or association, or any employee or agent therefor, to make or disseminate any statement or assertion of fact in a newspaper, circular, circular or form letter, or other publication published or circulated, including over the Internet, in any language in this state, concerning the extent, location, ownership, title, or other characteristic, quality, or attribute of any real estate located in this state or elsewhere, which is known to be untrue and which is made or disseminated with the intention of misleading. [¶] Nothing in this section shall be construed to hold the publisher of any newspaper, or any job printer, liable for any publication herein referred to unless the publisher or printer has an interest, either as owner or agent, in the real estate so advertised."

pleadings. Defendants argued that plaintiffs could not recover for any alleged unfair competition because any reliance on the alleged misrepresentations was unreasonable as a matter of law. Defendants pointed out that paragraph 9(a) of the Agreement specifically permitted defendants to change the "product, development plan . . . and marketing methods"[16] for the Development.

Defendants argued that plaintiffs could not recover on the second cause of action because any material change to the setup and offering that may have occurred at the Development occurred after plaintiffs had purchased their lots. According to defendants, since they were in compliance with the Subdivided Lands Act (Bus. & Prof. Code, § 11000 et seq.) at the time of the sale, there were no grounds for rescission or restitution.

Finally, defendants argued that plaintiffs could not recover on the third cause of action because the alleged misrepresentations were directly contradicted by paragraph 9(a) of the Agreement, which gave defendants the right to alter the Development. Therefore, any alleged misrepresentations were barred by the parol evidence rule. In addition, defendants argued that even if the alleged misrepresentations were considered, plaintiffs could not recover because the statements were true at the time they were made.

### Trial Court's Ruling

The trial court sustained the demurrer to the first cause of action on several grounds. To the extent plaintiffs were alleging that defendants acted fraudulently, the trial court concluded that plaintiffs did not plead actual reliance on

---

[16] Paragraph 9(a) of the Agreement states in full: "Changes in Price, Product, Development Plan and Marketing Methods. Buyer acknowledges that Seller may, in its sole discretion, change its pricing, product, development plan, incentive program and marketing methods. Without limitation, Seller may elect to sell residences or lots in this phase of the project, or in future phases, under terms and conditions which are more favorable than those set forth in this Agreement, including, without limitation, more favorable terms and conditions resulting from the sale of residences (or lots) in bulk to another builder or by auction (with or without reserve) to members of the general public. Seller may elect not to build residences on each lot of this phase or future phases of the project, or may elect to build a different type or size of residence on a smaller or larger lot, or may use different construction methods to build such residences. Seller may further elect to build residences of the same type in this or future phases, but to reduce the sales price for such residences, or to improve such residences with more or less expensive features and amenities. Any of the foregoing events may adversely affect the value of the Property. Nothing herein shall be interpreted as an express or implied warranty or representation that the Seller will refrain from any pricing program, product design program, development strategy or marketing plan which in any manner adversely affects the value of the Property, and Buyer acknowledges that no sales representative has made any contrary representation, or has made any representation regarding any potential appreciation of the Property, any resale value of the Property, or the effect of any component, option or amenity of the Property upon the value of the Property."

the alleged fraudulent statements contained in the SAC. To the extent plaintiffs were alleging that defendants acted in an unfair manner, the trial court concluded that the contract was not unfair as a matter of law. To the extent plaintiffs were basing this cause of action on statutory violations, the trial court concluded that plaintiffs failed to identify any statutory violation that could form the basis of an unfair competition cause of action.

The trial court sustained the demurrer to the second cause of action as it concluded there was nothing to indicate that the public report was invalid or illegal. Instead, the trial court concluded the report prepared by defendants was valid.

The trial court sustained the demurrer to the third cause of action because plaintiffs improperly sought monetary damages, a remedy not available under the statute. In addition, the trial court concluded that any allegation of false advertising on which plaintiffs might rely would be inadmissible under the parol evidence rule as the claimed false statements directly contradicted the written agreement, specifically paragraph 9(a) of the Agreement.

The trial court also granted defendants' motion to strike specific items in the SAC. The trial court ordered stricken allegations that (1) defendants engaged in unfair competition by including in the CC&R's a paragraph requiring each residence to be at least 2,700 square feet, (2) plaintiffs actually and reasonably relied on defendants' allegedly deceptive practices and false advertising, and (3) plaintiffs were entitled to recover monetary damages for alleged violations of the Subdivided Lands Act. The trial court ruled that the first item was precluded by the parol evidence rule, the second item was irrelevant, and the third item was improper because violations of the Subdivided Lands Act did not permit monetary recovery.

### Prior Rulings by the Trial Court

The SAC was preceded by six pleadings that attempted to state various causes of actions against defendants. Each complaint was attacked by defendants through a demurrer and/or a motion to strike. The trial court's rulings on these motions were similar to the above ruling.

The ruling on the motions directed at the original complaint sustained demurrers to several causes of actions based on allegations that defendants advertised and promoted the Development as requiring each residence constructed to be a custom home of at least 2,700 square feet. The trial court

concluded that such allegations were barred by the parol evidence rule because the Agreement specifically allowed defendants to build other types of homes. The trial court also sustained demurrers to fraud causes of action because plaintiffs did not plead reasonable reliance. The trial court concluded it was unreasonable to rely on representations made by defendants that directly were contradicted by the written documents. The arguments of the parties and the reasoning of the trial court were similar on the motions directed at the subsequent complaints filed by plaintiffs.

### Judgment

The trial court granted plaintiffs leave to amend the complaint. When plaintiffs failed to do so, defendants moved for judgment in their favor. Judgment was entered accordingly and plaintiffs appealed.

## DISCUSSION

### I. *Introduction*

#### *Standard of Review*

"For purposes of a demurrer, we accept as true both facts alleged in the text of the complaint and facts appearing in exhibits attached to it. If the facts appearing in the attached exhibit contradict those expressly pleaded, those in the exhibit are given precedence. [Citation.]" (*Mead v. Sanwa Bank California* (1998) 61 Cal.App.4th 561, 567–568 [71 Cal.Rptr.2d 625].) We review a ruling sustaining a demurrer de novo, independently determining whether the complaint states a cause of action as a matter of law. (*Desai v. Farmers Ins. Exchange* (1996) 47 Cal.App.4th 1110, 1115 [55 Cal.Rptr.2d 276].)

#### *Documents*

Defendants assert that many of plaintiffs' allegations may not be considered because they contradict the terms of the Agreement and the CC&R's.[17] These documents were attached to each of the complaints filed by plaintiffs. Three paragraphs from these documents form the basis for defendants' arguments.

Defendants first point to paragraph 9(a) of the Agreement, which states in relevant part: "Buyer acknowledges that Seller may, in its sole discretion,

---

[17] The Agreement and the CC&R's were both attached to each of plaintiffs' complaints and therefore were properly considered when the trial court ruled on the demurrer. (*City of Port Hueneme v. Oxnard Harbor Dist.* (2007) 146 Cal.App.4th 511, 514 [52 Cal.Rptr.3d 878].)

change its pricing, product, development plan, incentive program and marketing methods. Without limitation, Seller may elect to sell residences or lots in this phase of the project, or in future phases, under terms and conditions which are more favorable than those set forth in this Agreement . . . . Seller may elect not to build residences on each lot of this phase or future phases of the project, or may elect to build a different type or size of residence on a smaller or larger lot . . . . Any of the foregoing events may adversely affect the value of the Property. Nothing herein shall be interpreted as an express or implied warranty or representation that the Seller will refrain from any pricing program, product design program, development strategy or marketing plan which in any manner adversely affects the value of the Property, and Buyer acknowledges that no sales representative has made any contrary representation, or has made any representation regarding any potential appreciation of the Property, any resale value of the Property, or the effect of any component, option or amenity of the Property upon the value of the Property."

The next paragraph of the Agreement deemed relevant by defendants is paragraph 18(d), which states: "<u>Merger</u>. This is the only agreement between the parties and all prior and contemporaneous negotiations are merged herein and superseded hereby. The only representations, agreements and warranties made by Seller are those set forth in writing in this Agreement. No representations, agreements or warranties, express or implied, not expressly set forth in writing in this Agreement are made by Seller to or with Buyer."

Finally, defendants point out paragraph 6.1 of the CC&R's, which states: "<u>Amendment Procedure</u>. This Declaration may be amended or revoked in any respect with the vote or written consent of the holders of not less than 51% of the voting power of the Owners (including Declarant) and the vote or written consent of Declarant until: (i) Declarant no longer owns any Lots in the Development or any lots that may be annexed into the development; or (ii) the tenth anniversary of the recordation of this Declaration, whichever occurs first. For purposes herein, each Lot is entitled to one vote. If there are two or more Owners of any one Lot, the vote cast by any one Owner shall be conclusively presumed to be the vote cast for all the Owners of that Lot. If more than one vote is cast for any one Lot on any single issue, the vote of that Lot shall not be counted for that issue. Notwithstanding anything herein to the contrary, during the period commencing with the recordation of the Declaration and terminating on the 15th anniversary date thereof, the provisions of Article 7 may not be amended or rescinded without the prior written consent of the Declarant regardless of whether Declarant owns any Lots in the Development."

These paragraphs informed plaintiffs that (1) defendants had the option to change the marketing strategy for the Development, including the construction of tract homes; (2) defendants could construct homes of varying sizes in the Development; (3) the sales price for lots sold in the future may be different than that paid by plaintiffs and therefore may adversely affect the value of plaintiffs' lots; (4) defendants specifically disavowed any warranty or promise to limit the type or size of dwelling to be built within the Development; and (5) defendants retained the right to amend the CC&R's at any time, including the right to reduce the minimum size of any residence within the Development, so long as they owned more than 51 percent of the lots subject to the CC&R's.

In addition, plaintiffs agreed in the Agreement that (1) no representative for defendants had made any representation different from the above; (2) no representative of defendants had made any representation about possible future appreciation of the lots within the Development; and (3) the Agreement was the only agreement between the parties pursuant to the merger clause.

In addition to the portions of the documents on which defendants rely, we also find relevant paragraph 5.10 of the CC&R's. Paragraph 5.10 states: "Declarant Exemption. Declarant, or its successor or assign, shall not be subject to the approval requirements of this Article 5 in connection with the construction or alteration of any Improvement on the Development or the installation of any landscaping, provided that this exemption shall expire 90 days after Declarant has transferred title to the last Lot in the Development."

Article 5 of the CC&R's provides for establishment of an architectural committee and requirements for committee approval before constructing on the lot. An "improvement" is defined in paragraph 1.5 of the CC&R's as including the residence built on any lot. Therefore, defendants are specifically exempt from compliance with the provisions of article 5 when constructing any residence, thus rendering any claim by plaintiffs that defendants failed to do so irrelevant.

*Parol Evidence Rule*

Defendants' motions to the trial court, and their arguments in this court, largely relied on the assertion that the parol evidence rule, when applied to the above paragraphs, precluded admission of many of the allegations made by plaintiffs.

■ The parol evidence rule, codified in Code of Civil Procedure section 1856[18] and Civil Code section 1625,[19] generally prohibits the introduction of either oral or written extrinsic evidence to vary, alter, or add to the terms of an integrated written agreement, although extrinsic evidence introduced to explain the meaning of a written contract is admissible if the interpretation of the contract urged is consistent with the document. (*Casa Herrera, Inc. v. Beydoun* (2004) 32 Cal.4th 336, 343 [9 Cal.Rptr.3d 97, 83 P.3d 497] (*Casa Herrera*).) The rule is one of substantive law based on the concept that a written integrated contract establishes the terms of the agreement between the parties and evidence that contradicts the written terms is irrelevant. (*Id.* at pp. 343–344.) " '[A]s a matter of substantive law [evidence that contradicts an integrated written agreement] cannot serve to create or alter the obligations under the instrument.' [Citation.]" (*Id.* at p. 344.) In essence, the written agreement supersedes any prior or contemporaneous negotiations, either oral or written. (*Alling v. Universal Manufacturing Corp.* (1992) 5 Cal.App.4th 1412, 1434 [7 Cal.Rptr.2d 718] (*Alling*).)

■ An integrated agreement is a writing that constitutes the final expression of one or more terms of an agreement. (*Alling, supra,* 5 Cal.App.4th at p. 1434.) Whether a writing is an "integration" is a question of law to be decided by the trial court. (*Ibid.*) The trial court concluded, and we agree, that the Agreement was an integrated contract, specifically so stating in the above quoted merger clause. Plaintiffs do not contend otherwise.

---

[18] Code of Civil Procedure section 1856 states: "(a) Terms set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement. [¶] (b) The terms set forth in a writing described in subdivision (a) may be explained or supplemented by evidence of consistent additional terms unless the writing is intended also as a complete and exclusive statement of the terms of the agreement. [¶] (c) The terms set forth in a writing described in subdivision (a) may be explained or supplemented by course of dealing or usage of trade or by course of performance. [¶] (d) The court shall determine whether the writing is intended by the parties as a final expression of their agreement with respect to such terms as are included therein and whether the writing is intended also as a complete and exclusive statement of the terms of the agreement. [¶] (e) Where a mistake or imperfection of the writing is put in issue by the pleadings, this section does not exclude evidence relevant to that issue. [¶] (f) Where the validity of the agreement is the fact in dispute, this section does not exclude evidence relevant to that issue. [¶] (g) This section does not exclude other evidence of the circumstances under which the agreement was made or to which it relates, as defined in [Code of Civil Procedure] Section 1860, or to explain an extrinsic ambiguity or otherwise interpret the terms of the agreement, or to establish illegality or fraud. [¶] (h) As used in this section, the term agreement includes deeds and wills, as well as contracts between parties."

[19] Civil Code section 1625 states: "The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument."

With the above principles in mind, we now consider the demurrers to plaintiffs' causes of action.

## II. *Demurrers*

### *Plaintiffs' Cause of Action for Unfair Competition*

█ Plaintiffs assert that they have pled sufficient facts to state a cause of action for unfair competition, in violation of the UCL. This statute makes actionable any unlawful, unfair, or fraudulent business act or practice, or any unfair, deceptive, untrue, or misleading advertising. The statute specifically makes unlawful any act prohibited by Business and Professions Code section 17500 et seq., the chapter on false advertising. █ As relevant here, section 17500 makes it unlawful to advertise real property for sale in a manner that is untrue and misleading. █ Business and Professions Code section 17530 makes it unlawful to advertise for sale real property in a manner that is untrue and intended to mislead. █ Similarly, the Subdivided Lands Act makes it unlawful to advertise real property subject to its provisions in a manner that is false or misleading.

Plaintiffs cite these statutes and then make a blanket claim that the complaint contained sufficient allegations to overcome defendants' demurrer. We understand plaintiffs to be contending that their allegations that defendants' representation to the public that the Development was to consist exclusively of custom homes of at least 2,700 square feet and three-car garages was indeed an advertisement and was knowingly false when made.

Defendants rely on the parol evidence rule to assert that each of plaintiffs' factual allegations is contradicted by the terms of the written agreement and thus not admissible. We reject defendants' argument because it is an attempt to misuse the parol evidence rule. As explained *ante*, parol evidence is not admissible to vary, alter, or add to the terms of a written agreement. This cause of action does not attempt to vary, alter, or add to the terms of the written agreement between the parties. Instead, plaintiffs argue defendants engaged in a campaign of false advertising when marketing the lots in the Development.

The case on which defendants and the trial court relied demonstrates our point. In *Bank of America etc. Assn. v. Pendergrass* (1935) 4 Cal.2d 258 [48 P.2d 659] (*Pendergrass*), the plaintiff sued the defendants to recover money lent to the defendants and evidenced by a note. The terms contained in the note stated that the sum lent was payable on demand. The plaintiff introduced the note into evidence and presented testimony that the note had not been paid. The defendants attempted to introduce evidence that the

plaintiff agreed the defendants would not be required to make any payments on the note, either principal or interest, until after the defendants had sold their crop for that year.

 The Supreme Court observed that the defendants' argument was, in essence, that the plaintiff agreed not to require any payments for one year, a promise "in direct contravention of the unconditional promise contained in the note to pay the money on demand." (*Pendergrass, supra,* 4 Cal.2d at p. 263.) The Supreme Court held that such evidence was barred by the parol evidence rule. "Our conception of the rule which permits parol evidence of fraud to establish the invalidity of the instrument is that it must tend to establish some independent fact or representation, some fraud in the procurement of the instrument or some breach of confidence concerning its use, and not a promise directly at variance with the promise of the writing." (*Ibid.*)

In *Pendergrass* the parol evidence rule precluded evidence that the terms of the agreement were other than those terms contained in the writing (was the note payable on demand or did the parties agree that no payments would be due for one year?).

Here, plaintiffs are not arguing that the terms of the Agreement and the CC&R's prohibited defendants from building tract homes in the Development. Indeed, this cause of action is not an action on the contract. Instead, plaintiffs are alleging that defendants *advertised* the Development as one where only custom homes would be built, thus justifying selling the lots at a premium price. According to plaintiffs' theory, had defendants advertised the Development as a mixed custom/tract home development, the lots purchased by plaintiffs would have been worth considerably less than the price they paid. Thus, *Pendergrass* is distinguishable (allegations do not seek to vary or change the terms of the written agreement) and does not support defendants' argument.[20]

Instead, the issue in this cause of action is whether plaintiffs reasonably relied on this allegedly false advertising. This issue recently was addressed in *In re Tobacco II Cases* (2009) 46 Cal.4th 298 [93 Cal.Rptr.3d 559, 207 P.3d 20] (*Tobacco II*). The case was presented to the trial court as a class action lawsuit against various tobacco companies alleging the companies engaged in

---

[20] In the section of their brief titled "The Parol Evidence Rule Fully Applies to Claims Under the UCL," defendants cite only one case, *Wang v. Massey Chevrolet* (2002) 97 Cal.App.4th 856 [118 Cal.Rptr.2d 770] (*Wang*). Defendants argue that *Wang* is distinguishable from this case because it addresses causes of action related to the Consumers Legal Remedies Act (Civ. Code, § 1770 et seq.). We agree that *Wang* does not stand for the proposition that the parol evidence rule is inapplicable to actions under the UCL. However, neither does *Wang* stand for the proposition that the parol evidence rule is applicable to actions under the UCL.

a systematic and deceptive advertising campaign that resulted in the members of the class becoming addicted to cigarettes and suffering injuries as a result. The trial court originally granted class certification but later granted the defendants' motion to decertify the class. One of the issues addressed by the Supreme Court was the causation element of a UCL cause of action based on false or misleading advertising. (*Tobacco II*, at p. 306.) The issue presented itself because the 2004 amendment to the UCL added a requirement in private enforcement actions that the plaintiff must have "suffered injury in fact and has lost money or property *as a result of* the unfair competition." (Bus. & Prof. Code, § 17204, italics added, as amended by Prop. 64, § 3.)

■ The Supreme Court first noted the UCL identifies three forms of unfair competition: (1) practices that are unlawful; (2) practices that are unfair; and (3) practices that are fraudulent. (*Tobacco II, supra,* 46 Cal.4th at p. 311.) The allegation that the tobacco industry engaged in deceptive advertisements and misrepresentations about its products was an allegation of a fraudulent practice. (*Id.* at pp. 311–312.) " '[T]o state a claim under either the UCL or the false advertising law, based on false advertising or promotional practices, "it is necessary only to show that 'members of the public are likely to be deceived.' " ' [Citation.]" (*Id.* at p. 312.) "The fraudulent business practice prong of the UCL has been understood to be distinct from common law fraud. 'A [common law] fraudulent deception must be actually false, known to be false by the perpetrator and reasonably relied upon by a victim who incurs damages. None of these elements are required to state a claim for injunctive relief' under the UCL. [Citations.] This distinction reflects the UCL's focus on the defendant's conduct, rather than the plaintiff's damages, in service of the statute's larger purpose of protecting the general public against unscrupulous business practices. [Citation.]" (*Ibid.*)

■ The Supreme Court then turned its attention to the "as a result of" language of the 2004 amendment and concluded that it imposed "an actual reliance requirement on plaintiffs prosecuting a private enforcement action under the UCL's fraud prong." (*Tobacco II, supra,* 46 Cal.4th at p. 326.)

"This conclusion, however, is the beginning, not the end, of the analysis of what a plaintiff must plead and prove under the fraud prong of the UCL. Reliance is 'an essential element of . . . fraud . . . . [¶] . . . [R]eliance is proved by showing that the defendant's misrepresentation or nondisclosure was "an immediate cause" of the plaintiff's injury-producing conduct. [Citation.] A plaintiff may establish that the defendant's misrepresentation is an "immediate cause" of the plaintiff's conduct by showing that in its absence the plaintiff "in all reasonable probability" would not have engaged in the injury-producing conduct.' [Citation.]

■ "While a plaintiff must show that the misrepresentation was an immediate cause of the injury-producing conduct, the plaintiff need not demonstrate it was the only cause. ' "It is not . . . necessary that [the plaintiff's] reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor in influencing his conduct. . . . It is enough that the representation has played a substantial part, and so has been a substantial factor, in influencing his decision." [Citation.] [¶] Moreover, a presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material. [Citations.] A misrepresentation is judged to be "material" if "a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question" [citations], and as such materiality is generally a question of fact unless the "fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it." [Citation.]' [Citation.]" (*Tobacco II, supra,* 46 Cal.4th at pp. 326–327.)

Plaintiffs allege that when they decided to purchase their lots, they relied on the various advertisements as well as the statements of Pottorff that the Development would remain a custom home development. Defendants assert that plaintiffs' reliance was unreasonable because the written contracts specifically gave defendants the ability to change the nature of the Development.

This case comes before us after the trial court sustained defendants' demurrer to this cause of action. In sustaining defendants' demurrer, the trial court must have concluded as a matter of law that it was reasonably probable plaintiffs would have bought the lots even if defendants had not advertised the Development as a custom home development. Moreover, to overcome the presumption or inference of reliance, the trial court must have concluded that the advertisements and Pottorff's statements were not material, i.e., they were " ' "so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by [them]." ' " (*Tobacco II, supra,* 46 Cal.4th at p. 327.)

■ We conclude plaintiffs have pled the element of reliance sufficiently. We cannot conclude as a matter of law that plaintiffs would have bought their lots had they known that defendants intended to build tract homes in the Development or that the advertisements were not material. A reasonable jury *might* conclude that the advertisements and statements were material and that plaintiffs' reliance on them was reasonable. The jury rationally could conclude that defendants' retention of the right to alter the nature of the Development did not necessarily mean they would do so.

Accordingly, the trial court erred in granting defendants' demurrer to the UCL cause of action based on false or misleading advertising. Because

plaintiffs have pled sufficient elements to maintain a cause of action under the UCL, we need not consider the viability of other theories under the UCL.

*Plaintiffs' Cause of Action for False Advertising*

 Plaintiffs argue that they have pled sufficient facts to overcome defendants' demurrer to plaintiffs' cause of action for false advertising, in violation of Business and Professions Code section 17500. The Supreme Court has noted that any violation of this section also necessarily must violate the UCL. (*Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 950 [119 Cal.Rptr.2d 296, 45 P.3d 243] (*Kasky*).) Therefore, since plaintiffs have alleged sufficient facts to overcome defendants' demurrer to the cause of action for violation of the UCL based on false or misleading advertising, they necessarily have pled sufficient facts to defeat defendants' demurrer to the cause of action for violation of Business and Professions Code section 17500.

*Kasky* also supports our conclusion that the trial court erred in granting defendants' demurrers to the UCL and false advertising causes of action. In *Kasky*, the Supreme Court emphasized that both causes of action need only plead advertising that is false or misleading. The Supreme Court noted that both laws prohibit "not only advertising which is false, but also advertising which[,] although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public." (*Leoni v. State Bar* (1985) 39 Cal.3d 609, 626 [217 Cal.Rptr. 423, 704 P.2d 183], cited with approval in *Kasky, supra*, 27 Cal.4th at p. 951.) "Thus, to state a claim under either the UCL or the false advertising law, based on false advertising or promotional practices, 'it is necessary only to show that "members of the public are likely to be deceived." ' [Citations.]" (*Kasky*, at p. 951.) Thus, the terms of the contract are irrelevant to the cause of action. Instead, the focus is on whether the advertising was misleading or had a tendency to deceive or confuse the public.

*Plaintiffs' Cause of Action for Fraud*

Plaintiffs argue they also have pled sufficient facts to overcome defendants' demurrer to their cause of action for fraud based on a willful misrepresentation. They contend that defendants' advertising campaign intentionally was misleading and induced plaintiffs to buy lots in the Development. They further allege that defendants misrepresented what was meant by paragraph 9 of the Agreement.

Once again, defendants assert that the parol evidence rule precludes consideration of any statements that are inconsistent with the contract terms. They also argue that plaintiffs' reliance on the oral statements was not

justifiable as a matter of law because the statements were contradicted by the written documents. In response, plaintiffs contend that the oral statements are admissible under the fraud exception to the parol evidence rule. (Code Civ. Proc., § 1856, subd. (g).)

The scope of the fraud exception to the parol evidence rule is the crux of this issue. Our analysis must begin with *Pendergrass*, discussed *ante*. In summary, the Supreme Court held that the parol evidence rule precluded evidence that the bank promised it would not enforce a note for one year when the note stated it was payable on demand, i.e., at any time.

The *Pendergrass* rule has been criticized by some scholars because it prevents some actions based on a theory of promissory fraud. It is more properly characterized, however, as a rational policy choice that has never been reconsidered by the Supreme Court. (*Price v. Wells Fargo Bank* (1989) 213 Cal.App.3d 465, 485 [261 Cal.Rptr. 735] (*Price*).) This rule is consistent with the basis for the parol evidence rule: an integrated contract establishes the terms of the agreement between the parties, and evidence suggesting the terms are other than those stated in the agreement is irrelevant. (*Casa Herrera, supra*, 32 Cal.4th at pp. 343–344.) Accordingly, the tort of promissory fraud based on an oral promise is limited by the parol evidence rule when the oral promise directly contradicts the terms of the contract to which the parties agreed. (*Price*, at p. 485.)

*Pendergrass*, therefore, reflects a choice by the Supreme Court when faced with a conflict between contract principles and tort principles. The Supreme Court concluded that in this situation contract principles should be paramount to avoid injecting tort principles into the commercial context, where such principles do not readily fit. By doing so, the Supreme Court limited litigation over the terms of contracts under the "guise of a promise made without intention to perform" (*Price, supra*, 213 Cal.App.3d at p. 485) based on proof that the contract does not contain terms consistent with the alleged oral promises. "While the decision was by no means logically inevitable, it represents a rational policy choice that should be reconsidered only by the Supreme Court itself." (*Id.* at p. 486.)

The *Pendergrass* rule has been the subject of numerous opinions, some of which attempt to avoid its effects. In *Bank of America v. Lamb Finance Co.* (1960) 179 Cal.App.2d 498 [3 Cal.Rptr. 877] (*Lamb Finance*), Bank of America filed an action to recover on a note executed by Lamb Finance and guaranteed by the president of Lamb Finance, Leah Lamb Poyet. The guaranty stated that Poyet promised to pay the note signed by Lamb Finance and agreed that Bank of America could proceed against her in the event of default. Poyet attempted to testify that a bank employee told her when she

executed the note that she was not personally liable for the debt since it was a corporate note. The appellate court found the testimony inadmissible. "It is obvious from the face of the record that [this] portion of defendant Poyet's testimony directly contradicts the written guarantee signed by her; and that such testimony, falling squarely within the parol evidence rule, is clearly inadmissible to vary the terms of the instrument sued upon." (*Id.* at p. 501.)

In *Price*, the issue was presented in the context of a loan for a mobilehome. Price claimed he had arranged for a loan from another institution at a specific interest rate. Wells Fargo then told Price it would loan him the money to buy the mobilehome at a lower interest rate. By the time the application process was completed, the interest rate charged by Wells Fargo exceeded the original interest rate offered by the other institution. The other institution, however, no longer offered the lower interest rate, so Price entered into an integrated contract to borrow the money from Wells Fargo at the higher interest rate. Price argued in his complaint that Wells Fargo committed fraud by promising him a lower interest rate than the other institution, with no intent of doing so. The appellate court concluded that Price's allegation was barred by the parol evidence rule because it reflected a contemporaneous oral agreement that contradicted the terms of the contact. (*Price, supra*, 213 Cal.App.3d at p. 486.)

In *Continental Airlines, Inc. v. McDonnell Douglas Corp.* (1989) 216 Cal.App.3d 388 [264 Cal.Rptr. 779] (*Continental*), Continental purchased several commercial passenger aircraft from McDonnell. Prior to entering into the contract for the purchase, McDonnell presented Continental with numerous sales brochures and participated in numerous meetings regarding the proposed purchase. The brochures represented that the fuel tanks in the wings of the aircraft " 'will not rupture under crash load conditions.' " (*Id.* at p. 400.) Similar representations were made during meetings held before the contract was executed. The contract, however, which was an integrated document, stated that the fuel tanks were " 'not likely' to rupture" in a specific type of crash. (*Ibid.*) Continental sued when one of the wing fuel tanks ruptured during an aborted takeoff.

McDonnell moved in limine to preclude Continental from introducing the statement in the sales brochure that represented that the fuel tanks would not rupture. Continental argued the statement was admissible under the fraud exception to the parol evidence rule. The appellate court, citing *Pendergrass*, held the statements were not admissible because they contradicted a term of the integrated sales contract. (*Continental, supra*, 216 Cal.App.3d at p. 419.)

The appellate court, however, concluded other similar statements were admissible. The sales brochures also stated that the wing and landing gear

*had already been* designed so that in the event of a crash the landing gear would fail first to avoid the possibility that the wing fuel tank would rupture. Continental established at trial that these representations were false; no such design had been developed. These representations were admissible as *factual representations* made by McDonnell that it had already completed design of the wing/landing gear assembly as described. (*Continental, supra*, 216 Cal.App.3d at p. 423.)

*Banco Do Brasil, S.A. v. Latian, Inc.* (1991) 234 Cal.App.3d 973 [285 Cal.Rptr. 870] (*Banco Do Brasil*) involves a complicated fact pattern. In a very simplified form, Latian was formed to acquire the assets of another business. These assets were security for loans made by Banco Do Brasil to the original owners of the assets. To accomplish the acquisition, Latian agreed to assume liability for a portion of the amount due to Banco Do Brasil. When Latian had difficulty making the payments required by the loan agreements, the guaranty that formed the basis of the lawsuit was executed by Latian. When required payments were not made, Banco Do Brasil sued on the guaranty. Latian filed a cross-complaint alleging that Banco Do Brasil had promised to provide it with a new $2 million line of credit, but failed to do so. This promise was alleged to be an integral part of the agreement to guarantee the original loan. Latian alleged causes of actions for fraud and breach of contract.

The appellate court observed that Latian's defense to Banco Do Brasil's complaint, and the basis of the cross-complaint, was the assertion that Banco Do Brasil orally had promised to extend to Latian a $2 million line of credit. (*Banco Do Brasil, supra*, 234 Cal.App.3d at p. 999.) Indeed, Latian repeatedly testified at trial and argued to the appellate court that the line of credit was critical to Latian's decision to purchase the assets. Latian asserted that without the oral promise to extend the line of credit, Latian would not have purchased the assets. Banco Do Brasil argued the oral promise should have been excluded under the parol evidence rule. The trial court concluded it was an independent agreement, thus avoiding the parol evidence rule.

The appellate court concluded that because Latian took the position that the line of credit was an essential part of the guaranty agreement, and the contract stated that the obligation to repay the debt was unconditional, the alleged oral agreement contradicted the contract and was inadmissible under the parol evidence rule. (*Banco Do Brasil, supra*, 234 Cal.App.3d at pp. 1004–1005.)

The appellate court also rejected Latian's argument that the parol evidence rule was inapplicable because the evidence fell under the fraud exception to the rule. (*Banco Do Brasil, supra*, 234 Cal.App.3d at pp. 1009–1010.)

Relying on *Pendergrass* and its progeny, the appellate court concluded that the alleged oral promise to extend a line of credit to Latian constituted promissory fraud and thus was inadmissible. (*Banco Do Brasil*, at pp. 1009–1010.)

*Alling, supra*, 5 Cal.App.4th 1412 is another case with complicated facts. Alling[21] owned a company attempting to develop and market an electronic ballast to be used with florescent lights. Alling had the right to develop and market a specific ballast design. He entered into several agreements with different parties to do so, but each venture failed, generally because producing the complicated design proved difficult. Alling decided the difficulties in production were the result of insufficient capital investment. He developed a business plan and began looking for investors, eventually entering into negotiations with Universal. The business plan was overly optimistic. Nonetheless, Alling repeatedly attempted to incorporate the terms of the business plan into the purchase contract, including a requirement that Universal invest large amounts of capital into the product. Universal refused to include any reference to the business plan or any promise about the amount of capital it would invest in producing the ballast. The final contract included a commitment not to terminate production for a period of two years but gave Universal the option to do so after the initial two-year period.

Initially, Universal's attempts to produce the ballast based on the design advanced by Alling were unsuccessful. Nonetheless, after five years Universal finally solved the design and production issues and began producing and marketing the ballasts. Alling quit before the issues were resolved, asserting that all the production problems were directly related to inadequate investment by Universal.

Alling then sued Universal on various grounds. Prior to trial, Universal moved to prohibit any testimony suggesting that Alling's business plan was part of the purchase contract. Alling argued that Universal had promised to implement the business plan, and its failure to do so was the basis of the action. The trial court eventually allowed the business plan into evidence and judgment was entered in favor of Alling.

Universal argued on appeal that admission of the business plan violated the parol evidence rule. The appellate court found the purchase agreement was an integrated contract and that the business plan was inconsistent with the contract. Accordingly, the appellate court concluded the trial court erred in permitting the business plan to be introduced into evidence. (*Alling, supra*, 5

---

[21] We refer to the parties simply as Alling and Universal to ease the reader's task and because the issue of interest to us is not affected by the numerous additional parties, including wholly owned corporations, subsidiaries, and successor corporations.

Cal.App.4th at pp. 1435–1436.) The appellate court also rejected Alling's argument that the business plan was admissible under the fraud exception to the parol evidence rule.

 " 'Promissory fraud' is a promise made without any intention of performing it. [Citations.] The fraud exception to the parol evidence rule does not apply to such promissory fraud if the evidence in question is offered to show a promise which contradicts an integrated written agreement. Unless the false promise is either independent of or consistent with the written instrument, evidence thereof is inadmissible. [Citations.] [¶] . . . [¶]

"Here, plaintiffs offered the business plan for the express purpose of showing a fraudulent oral promise which was directly at variance with the terms of the Purchase Agreement. The alleged unequivocal oral promise to fund the business plan, elicited in testimony and referred to repeatedly by plaintiffs' trial attorney both in opening and in closing argument, varied and contradicted the specific language in paragraph 5 of the Purchase Agreement giving Universal 'the sole right to determine any amounts of capital resources which it may invest in [Alling's company] . . . .' The evidence of that alleged promissory fraud was therefore improperly admitted. [Citation.]" (*Alling, supra*, 5 Cal.App.4th at pp. 1436–1437.)

*Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15 [61 Cal.Rptr.2d 518] (*Edwards*) addressed the application of the parol evidence rule to a release and settlement agreement. The plaintiffs had purchased homes from the defendants that had been built on salt marshes. When the defendants first received complaints from homeowners (not the plaintiffs) about cracks in the foundations of their homes, the defendants hired an engineering firm and made extensive modifications to the foundation pursuant to the firm's recommendations.

Approximately one year later, the plaintiffs discovered cracks in the foundations of their homes and they contacted the defendants. The defendants again retained an engineering firm to investigate, but the investigation was neither as thorough nor as extensive as in the previous repair. The engineer recommended a different, less extensive and cheaper repair to the plaintiffs' homes. The plaintiffs received the engineer's report, reached an agreement with the defendants, and permitted the defendants to complete repairs consistent with the report. The plaintiffs also signed a settlement agreement releasing the defendants from any and all liability " 'in any way connected with the design and construction of the concrete slab foundation, adjoining soil areas . . . and the investigation of defects or damages claimed to such improvements.' " (*Edwards, supra*, 53 Cal.App.4th at p. 24, fn. 4.)

Approximately five years later, the plaintiffs discovered new cracks in the foundations of their homes and learned the problems were related to a design defect not remedied by the initial repairs. The plaintiffs sued, alleging various causes of action including fraud, negligent misrepresentation, and breach of contract. The trial court concluded that the parol evidence rule precluded introduction of any evidence about communication between the defendants and the plaintiffs prior to entering into the settlement agreement.

■ The appellate court held that the trial court erred in excluding such evidence. The defendants argued that the plaintiffs were attempting to change the terms of the settlement agreement by alleging the defendants made false promises that the proposed repairs would remedy all possible future foundation problems. The appellate court disagreed. "[Defendants'] argument misses the mark. It assumes [plaintiffs'] rescission claim is for promissory fraud based on alleged independent false promises by [defendants] contradicting the terms of the release. Such a claim would be barred by the parol evidence rule. [Citations.] Here, however, [plaintiffs] argue for rescission of the releases based not on promissory fraud, but on fraud in the inducement or procurement through alleged misrepresentations of fact. [Citation.] Evidence of such fraud is admissible in an action for rescission because it does not go to contradict the terms of the parties' integrated agreement, but to show instead that the purported instrument has no legal effect. [Citations.] Thus, the trial court erred in granting [defendants'] motions *in limine* on the ground of the parol evidence rule." (*Edwards, supra*, 53 Cal.App.4th at p. 42.)

*Wang, supra*, 97 Cal.App.4th 856 involved Wang's acquisition of a vehicle from Massey Chevrolet. Wang asserted that he repeatedly told Massey's representatives that he wanted to make a large downpayment, finance the remaining balance for a few months, and then pay the balance of the purchase price. Massey convinced Wang to sign a lease that Massey asserted would allow Wang to accomplish his goal of paying off the vehicle in two or three months. A few days later Massey called Wang and informed him that Massey had found a new loan company to fund the lease with a lower monthly payment. Massey represented to Wang that he could pay off the vehicle at any time with no penalty. When Wang attempted to pay off the vehicle a few months later, he learned that the lease contained a substantial penalty for early payment. Wang sued Massey for fraud, violation of the Consumers Legal Remedies Act, and violation of the UCL. The trial court granted Massey's motion for summary judgment based primarily on its conclusion that the oral statements made by Massey's representatives were barred by the parol evidence rule.

The appellate court concluded that the parol evidence rule was inapplicable to statutory claims under the Consumers Legal Remedies Act because the

language of the statute contemplated actions involving contemporaneous oral promises, and to prohibit such promises through the parol evidence rule would defeat the Legislature's intent in enacting the statutory scheme. (*Wang, supra*, 97 Cal.App.4th at pp. 867–870.) Similarly, the appellate court concluded that the parol evidence rule did not apply to the UCL cause of action because it incorporated the allegations of violation of the Consumers Legal Remedies Act.

 The appellate court found, however, that summary adjudication of the fraud cause of action was proper because the parol evidence rule precluded evidence of the statements made by Massey's employees that Wang could terminate the lease early without penalty because these statements directly contradicted the lease. (*Wang, supra*, 97 Cal.App.4th at p. 876.) The court relied on *Alling* and *Pendergrass* to support its conclusion. "The fraud exception to the parol evidence rule [citation], 'does not apply to such promissory fraud if the evidence in question is offered to show a promise which contradicts an integrated written agreement. Unless the false promise is either independent of or consistent with the written instrument, evidence thereof is inadmissible.' ([*Alling, supra*,] 5 Cal.App.4th [at p.] 1436 . . . .) Under the *Pendergrass* rule, the fraud exception to the parol evidence rule does not apply where parol evidence is offered to show a fraudulent promise ' "directly at variance with the promise of the writing." ' ([*Continental*], *supra*, 216 Cal.App.3d at p. 419, italics omitted.)" (*Wang*, at p. 873.)

*Pacific State Bank v. Greene* (2003) 110 Cal.App.4th 375 [1 Cal.Rptr.3d 739] (*Greene*) created an exception to the rule stated in *Pendergrass*. Greene's husband entered into several loan agreements with Pacific State Bank using various items as collateral. One item of collateral was a trailer that Greene agreed to purchase from her husband. Greene agreed to assume the loan secured by the trailer as the purchase price. Pacific State Bank agreed to this arrangement and prepared two guaranty agreements for Greene to sign (one for Greene personally and one for her business). Each agreement listed the amount of the loan on the trailer as the maximum liability to which Greene was exposed. Each guaranty, however, defined the indebtedness to which the guaranty applied as all of the husband's loans.

Greene made all payments on the trailer loan, but her husband defaulted on the other loans. Pacific State Bank sued Greene and her husband for the amounts due under the loans. Greene opposed Pacific State Bank's motion for summary judgment by executing a declaration that claimed Pacific State Bank's employees had told her that the guaranty she signed related only to the loan secured by the trailer. Greene asserted she told Pacific State Bank that she would not guarantee any of her husband's other loans with the bank,

and Pacific State Bank's employee assured her that she was not doing so. Pacific State Bank objected to this portion of Greene's declaration, arguing that the evidence was inadmissible because it violated the parol evidence rule. The trial court agreed, sustained the objection, and granted the motion for summary judgment.

The appellate court agreed that Greene's statements contradicted the terms of the guaranty agreement and thus were not admissible to interpret the language of the guaranties. (*Greene, supra*, 110 Cal.App.4th at pp. 385–387.) The appellate court, however, held Greene's statements were admissible under the fraud exception to the parol evidence rule. It interpreted Greene's argument as asserting that she was induced to enter the guaranty agreements due to the fraud perpetrated by Pacific State. Bank's employees. (*Id.* at p. 389.) It recognized *Pendergrass*'s limitation on the admission of parol evidence of promises that contradict the terms of an integrated contract (promissory fraud), but concluded this limitation was inapplicable because Greene was alleging that there was a misrepresentation of the terms of the document, i.e., a misrepresentation of fact over the contents of the document at the time of its execution. (*Greene*, at p. 391.) The appellate court found significant that in many respects the guaranty agreements appeared to be consistent with Greene's contention that she guaranteed only the trailer loan, and the expansion of liability was found in the "fine print of a definition." (*Id.* at p. 393.)

The viability of the reasoning of *Greene* is uncertain. On April 20, 2011, the Supreme Court accepted for review *Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.* (2011) 191 Cal.App.4th 611 [119 Cal.Rptr.3d 380], review granted April 20, 2011, S190581, an opinion from this court. *Riverisland* relied on *Greene* in holding that the parol evidence rule did not bar evidence that a party misrepresented the contents of a written agreement. The issue to be decided is whether "the fraud exception to the parol evidence rule permit[s] evidence of a contemporaneous factual misrepresentation as to the terms contained in a written agreement . . . ." (Admin. Off. of Courts, Supreme Ct. Summary of Cases Accepted During Week of Apr. 18, 2011.) Thus, *Greene* may be overruled in the future.

We have reviewed these cases in an attempt to establish some parameters for the parol evidence rule. Appellate courts have consistently excluded evidence that the party seeking to enforce a contract made promises inconsistent with the contract. (*Pendergrass, supra*, 4 Cal.2d 258 [promise not to demand payment for one year]; *Lamb Finance, supra*, 179 Cal.App.2d 498 [promise that defendant would not have any personal liability on the note]; *Continental, supra*, 216 Cal.App.3d 388 [promise that fuel tank would not rupture in a crash]; *Banco Do Brasil, supra*, 234 Cal.App.3d 973 [promise to

extend a line of credit as inducement to sign a personal guaranty]; *Alling, supra*, 5 Cal.App.4th 1412 [promise to comply with terms of business plan specifically excluded from contract]; *Wang, supra*, 97 Cal.App.4th 856 [representation contract could be terminated early without penalty].) The appellate courts also have concluded, however, that the fraud exception to the parol evidence rule permitted testimony that (1) the defendants falsely represented that an aircraft had been designed to react in a specific manner in the event of a crash (*Continental*), (2) the defendants made misrepresentations of fact that induced the plaintiffs to enter into the contract (*Edwards*), and (3) the defendants misrepresented the contents of a contract (*Greene*).

Here, we do not agree with plaintiffs that their claims fall within the fraud exception to the parol evidence rule. Plaintiffs' argument is, in essence, that defendants promised them that the Development would contain only custom homes, even though the Agreement specifically reserved to defendants the right to build other types of houses, including tract homes. In other words, plaintiffs allege that defendants promised they would not utilize a right included in the contract. This promise was no different than the promises allegedly made in *Pendergrass, Lamb Finance, Continental, Banco Do Brasil, Alling, and Wang* and thus is not admissible.

Although it is unclear whether plaintiffs are asserting that defendants misrepresented the terms of the contract, as in *Greene*, such an argument would not change our conclusion, even assuming the continued viability of *Greene*. In *Greene* the defendant allegedly told Greene that her liability would extend only to a specific loan and not other loans made to her husband. The guaranty she signed made her liable on all of the loans made to her husband. Thus, the bank's employee represented that the contract did not contain a term that was included in the document.

We are not certain of the extent of the *Greene* exception to *Pendergrass*. We are confident, however, that if the exception has any continued validity, it does not encompass the facts in this case. Unlike *Greene*, the language about which plaintiffs now complain was not hidden in the fine print, but was highlighted for them specifically as evidenced by their initials being placed next to the paragraph. Instead, plaintiffs assert defendants lied to them about what the paragraph meant.

Accordingly, the trial court did not err in granting defendants' demurrer to this cause of action.

III. *Causes of Action for Breach of Fiduciary Duty and Constructive Fraud*

In addition to filing numerous demurrers and motions to strike, defendants also made a motion for summary adjudication directed at the fifth (breach of

fiduciary duty) and sixth (constructive fraud) causes of action. The trial court granted defendants' motion to these causes of action in the third amended complaint. Plaintiffs argue the trial court erred in doing so.

*Standard of Review*

A party may move for summary adjudication of a cause of action if that party contends that there is no merit to the cause of action. (Code Civ. Proc., § 437c, subd. (f)(1).) A defendant moving for summary adjudication establishes that there is no merit to a cause of action if he or she has shown that one or more elements of a cause of action cannot be established. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849 [107 Cal.Rptr.2d 841, 24 P.3d 493].)

"We review the trial court's decision de novo, considering 'all of the evidence set forth in the [supporting and opposition] papers, except that to which objections have been made and sustained by the court, and all [uncontradicted] inferences reasonably deducible from the evidence.' [Citation.] ' "To succeed, [the moving party] must . . . demonstrate that under no hypothesis is there a material issue of fact that requires the process of a trial." ' [Citations.]" (*Artiglio v. Corning Inc.* (1998) 18 Cal.4th 604, 612 [76 Cal.Rptr.2d 479, 957 P.2d 1313].)

*Pleadings*

The fifth cause of action alleged a breach of fiduciary duty against each defendant. The basis for this cause of action was the allegation that defendants, as real estate brokers, agents, and developers, owed a fiduciary duty to plaintiffs, and they breached that duty by concealing that tract homes were to be built in the Development. The sixth cause of action, titled "constructive fraud," alleged defendants committed constructive fraud against plaintiffs based on the same relationship and acts described in the fifth cause of action.

*Facts*

Each plaintiff signed an identical Agreement. Paragraph 9(i) of this agreement addresses the nature of the relationship between the real estate broker, McCaffrey Home Realty, and the plaintiff buyers. This paragraph states in full: "Agency Confirmation (California Civil Code § 2079.17). McCaffrey Home Realty is both the 'listing agent' and the 'selling agent' in the purchase and sale transaction contemplated by this Agreement. The 'listing agent' is the real estate broker who has obtained a listing of real property from the Seller to act as an agent of the Seller for compensation. The 'selling agent' means an agent who sells or finds and obtains buyers for real property and

presents offers to purchase to the Seller. MCCAFFREY HOME REALTY IS THE AGENT OF [X] THE SELLER EXCLUSIVELY; OR [ ] BOTH THE BUYER AND SELLER. IN ITS CAPACITY AS BOTH THE LISTING AGENT AND THE SELLING AGENT, MCCAFFREY HOME REALTY IS ACTING AS THE AGENT OF BOTH BUYER AND SELLER IN CONNECTION WITH THE PURCHASE AND SALE CONTEMPLATED BY THIS AGREEMENT. McCaffrey Home Realty is affiliated by ownership with the Seller."

In addition to this paragraph of the Agreement, plaintiffs were provided with a document titled "DISCLOSURE REGARDING REAL ESTATE AGENCY RELATIONSHIPS." This document identified McCaffrey Home Realty as the "AGENT" and the respective plaintiffs as the "BUYER/ SELLER." It also explained the duties of a real estate broker when acting as the seller's agent, the buyer's agent, and when representing both the buyer and seller (dual agency). This document, and the information contained therein, is required by Civil Code section 2079.14 et seq.

Finally, during their depositions, several plaintiffs testified that they thought McCaffrey Home Realty was acting as their agent throughout the purchase process.

### Procedure

Defendants' motion asserted that none of the defendants had a fiduciary relationship to plaintiffs, and thus there was no fiduciary duty between the parties that could be breached. Plaintiffs countered that there was a fiduciary relationship between the parties because defendants acted as their broker in the transaction.

### Trial Court's Ruling

The trial court concluded that paragraph 9(i) of the Agreement established that none of the defendants acted as a real estate agent or broker for plaintiffs, therefore no fiduciary duty existed. The trial court found that the Agreement was clear and unambiguous because an "X" was placed in the portion of the fourth sentence of paragraph 9(i) to indicate that McCaffrey Home Realty was acting as the agent for only the seller.

### Analysis

Defendants contend, and plaintiffs do not argue otherwise, that the causes of action for breach of fiduciary duty and constructive fraud are both based on the assertion that defendants owed a fiduciary duty to plaintiffs. Therefore,

the only issue decided by the trial court, and the only issue we must decide, is whether there is a triable issue of fact about whether McCaffrey Home Realty acted as an agent for both parties or acted as an agent for only the seller.

Defendants' argument, and the basis for the trial court's ruling, was that paragraph 9(i) of the Agreement was susceptible of only one interpretation, and that interpretation established that McCaffrey Home Realty was acting as an agent for only the seller.

▇▇▇ When interpreting a contract, we must give effect to the mutual intention of the parties at the time of contracting, to the extent such intent is ascertainable and lawful. (Civ. Code, § 1636.) We begin our interpretation by reviewing the language of the contract, because "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." (*Id.*, § 1638.) ▇▇▇ Generally, the words of a contract are to be understood in their ordinary and popular sense, unless used by the parties in a technical sense. (*Id.*, § 1644.)

▇▇▇ A contract provision is considered ambiguous when it may be interpreted in two or more ways, both of which are reasonable. (*TRB Investments, Inc. v. Fireman's Fund Ins. Co.* (2006) 40 Cal.4th 19, 27 [50 Cal.Rptr.3d 597, 145 P.3d 472].) The language of a contract, however, must be interpreted as a whole (Civ. Code, § 1641), and a contract cannot be found ambiguous in the abstract. (*TRB Investments*, at p. 27.)

The ambiguity in paragraph 9(i) is apparent when each sentence is considered in isolation. The first sentence unequivocally states that McCaffrey Home Realty is both the listing and selling agent. The next two sentences define the terms "listing agent" and "selling agent." The fourth sentence is in all capital letters and, as marked with the "X," states that McCaffrey Home Realty is the agent for the seller exclusively. The fifth sentence, also in all capital letters, then states that McCaffrey Home Realty, in its capacity as both the listing and selling agent, is acting as the agent for both the buyer and the seller. Finally, the last sentence informs the buyer that McCaffrey Home Realty is owned by at least some of the same principles as the seller.

It is impossible to reconcile these sentences. The first and fifth sentences state that McCaffrey Home Realty is acting as both the listing and selling agent. The fourth sentence is prepared so that, depending on how it is marked, it could indicate that McCaffrey Home Realty is acting as the seller's agent exclusively, or is acting as the agent for both the buyer and the seller. As marked, it indicates that McCaffrey Home Realty is acting exclusively as the agent for the seller. But this statement cannot be reconciled with the first

and fifth sentences, which both state McCaffrey Home Realty is acting as the agent for both the buyer and seller. Clearly, paragraph 9(i) is a model of ambiguity.

██ Since paragraph 9(i) is ambiguous, two additional principles are applicable. First, when a contract is uncertain, the language of the contract should be interpreted "most strongly against the party who caused the uncertainty to exist." (Civ. Code, § 1654.) ██ Second, extrinsic evidence can be admitted to explain the ambiguity in the contract. (*Appleton v. Waessil* (1994) 27 Cal.App.4th 551, 554 [32 Cal.Rptr.2d 676]; *Sweeney v. Earle C. Anthony, Inc.* (1954) 128 Cal.App.2d 232, 235 [275 P.2d 56].) Once extrinsic evidence is considered, the interpretation of the contract becomes a question of fact for the trier of fact. (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 847 [57 Cal.Rptr.3d 363].)

The trial court erred in granting summary adjudication for two reasons. First, it refused to consider extrinsic evidence because it found no ambiguity in paragraph 9(i). As explained above, paragraph 9(i) plainly is ambiguous, and therefore *relevant* extrinsic evidence should be admitted and considered by the trier of fact. Second, the ambiguity in paragraph 9(i) compels the conclusion that there is a triable issue of fact as to whether McCaffrey Home Realty was the exclusive agent for the seller or was the agent for both the buyer and seller, giving rise to a fiduciary relationship with plaintiffs.

## CONCLUSION

We emphasize the limited scope of our decision. We determine only that plaintiffs have pled sufficient facts to proceed on their unfair competition and false advertising causes of action and that a triable issue of fact exists as to the breach of fiduciary duty and constructive fraud causes of action. We express no opinion on the merits of plaintiffs' claims.

## DISPOSITION

The judgment is reversed. The trial court is directed to vacate the order sustaining defendants' demurrer to the causes of action for false advertising and unfair competition and enter a new order overruling the demurrers. The trial court also is directed to vacate the order granting defendants' motion for summary adjudication on the causes of action for breach of fiduciary duty and constructive fraud and to enter a new order denying this motion. Plaintiffs can therefore proceed on their causes of action for unfair competition (Bus. & Prof. Code, § 17200), false advertising (*id.*, § 17500), breach of fiduciary duty, constructive fraud, and trespass (to which the demurrer had been overruled when plaintiffs chose not to file a seventh amended

complaint). Since plaintiffs did not argue the validity of any other cause of action, they are deemed to have abandoned those causes of action and may not pursue them any further. Plaintiffs are awarded their costs on appeal.

Wiseman, Acting P. J., and Kane, J., concurred.